# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| JEREMY PINSON, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 18-486 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 116, 118, 130 |
| | : | | |
| U.S. DEPARTMENT OF JUSTICE, *et al.*, | : | | |
| | : | | |
| Defendant. | : | | |

## <u>MEMORANDUM OPINION</u>

### Granting in Part and Denying in Part Plaintiff's Motion for Leave to File a Second Amended Complaint, Denying Individual Defendants' Motion to Dismiss as Moot, and Denying Plaintiff's Motion for Sanctions and Return of Documents

## I. INTRODUCTION

Pro se Plaintiff Jeremy Pinson seeks leave to file a Second Amended Complaint in order to bring new claims, and expand upon existing ones, challenging her[1] transfer from a United States penitentiary in Minnesota to one in Arizona as well as other alleged mistreatment at the hands of prison officials during her incarceration. According to Pinson, the transfer deprived her of access to treatment for gender dysphoria and mental health issues. Defendants—the United States, several federal agencies, and various federal officials—oppose any amendment; they argue that Pinson's proposed Second Amended Complaint would radically expand the scope of the action and that the claims Pinson seeks to assert are futile. But with two exceptions, the arguments Defendants advance fail to persuade the Court that this is so. The Court denies the

---

[1] Pinson identifies using feminine pronouns, so the Court follows suit. *See Pinson v. U.S. Dep't of Justice*, 246 F. Supp. 3d 211, 214 n.1 (D.D.C. 2017), *on reconsideration*, 514 F. Supp. 3d 232.

motion to amend to the extent Pinson seeks to add Administrative Procedure Act, Fifth

Amendment, and Eighth Amendment claims challenging the conditions of her confinement.

Otherwise, the Court grants the motion to amend, and, accordingly, denies the pending motion to

dismiss the First Amended Complaint as moot.  For reasons explained below, the Court also

denies Pinson's motion for sanctions, ECF No. 130.

## II.  BACKGROUND

Pinson is currently an inmate at U.S. Penitentiary ("USP") Coleman II, a federal prison

located in Florida.  While in federal custody, Pinson filed dozens of Freedom of Information Act

("FOIA") requests with different components of the U.S. Department of Justice ("DOJ") as well

as with the Central Intelligence Agency ("CIA").  *See Pinson v. Dep't of Justice*, No. 18-cv-0486

(RC), 2020 WL 1509517 (D.D.C. Mar. 30, 2020) (ECF No. 79) (discussing these requests at

length).  She then filed a complaint in this Court, which she subsequently amended, alleging that

the FOIA responses she received were inadequate.  *Id.* at *1.  This Court entered summary

judgment against Pinson on many of her FOIA claims and dismissed others, but denied summary

judgment with respect to twelve of her requests to the Federal Bureau of Investigation ("FBI"),

twenty-seven of her requests to the Federal Bureau of Prisons ("BOP"), and all four of her

requests directed to the Department of Justice's Office of the Inspector General ("OIG").  *Id.*

Defendants proceeded to process the remaining FOIA requests.  ECF No. 133.

In addition to the FOIA claims, the operative First Amended Complaint ("FAC") brought

claims under the Administrative Procedure Act ("APA"), 5 U.S.C. §551 *et seq.*, the Privacy Act,

5 U.S.C. § 552a, and the First Amendment.  Am. Compl. at 1, ECF No. 16.  The FAC named

several individual defendants alongside the agency defendants[2]: John Dignam, former Chief of Internal Affairs at the BOP; Charles Samuels, former Director of the BOP; Mark Inch, former Director of the BOP; Kara Anderl (née Lundy), a BOP attorney, Charles Stroble, a BOP attorney, and Lamine N'Diaye, BOP's current Chief of Internal Affairs.  Noting that the FAC went "no further than listing '[v]iolation of the Administrative Procedures [sic] Act,' without specifying which agency action [Pinson] wishe[d] to challenge or any other factual allegations" and that Pinson had not briefed the APA claims, the Court dismissed the APA claims as conceded.  *Pinson*, 2020 WL 1509517 at *23.  Similarly, though the FAC listed "Violation of the Eighth Amendment" as a claim, Amend. Compl. at 1, its allegations did not elaborate on any Eighth Amendment claim.  Notably, the FAC did not include any allegations regarding Pinson's medical treatment.

As for the First Amendment, Pinson alleged that in 2017, she was incarcerated at Federal Medical Center Rochester, in Minnesota.  Am. Compl. at 2.  Anderl approached Pinson with an offer to settle a separate lawsuit Pinson was pursuing against prison officials, but Pinson refused and continued to litigate the case.  *Id.*  Allegedly in retaliation, Pinson was transferred to the United States Penitentiary in Tucson, Arizona, a facility where inmates enjoy fewer freedoms than at Rochester, in early 2018.  *Id.*  Additionally, various prison staff members allegedly retaliated against Pinson's litigation campaign by destroying or withholding her mail, repeatedly searching her cell, and withholding meals.  *Id.*  The First Amended Complaint's Privacy Act claim turned on the allegation that Dignam and N'Diaye "placed false information into agency records maintained . . . about the plaintiff, knowing that plaintiff's misconduct allegations were

---

[2] The agencies named in the FAC were the DOJ, the OIG, the Executive Office for United States Attorneys ("EOUSA"), the FBI, the DOJ's Office of Information Policy ("OIP"), the United States Marshals Service, and the CIA.  Am. Compl. at 1.

true." *Id.* at 3.  In addition to FOIA relief, the FAC sought an injunction requiring correction of Pinson's records and damages against the individual defendants.  *Id.* at 3.

Dignam, Samuels, Inch, Lundy, Stroble, and N'Diaye filed a motion to dismiss.  Indiv. Defs.' Mot. Dismiss, ECF No. 116.  Pinson responded by moving for leave to file a second amended complaint.  Pl.'s Mot. for Leave to File, ECF No. 118.  Her attached Proposed Second Amended Complaint drops the EOUSA, the OIP, the U.S. Marshals, and the CIA from the suit, but names the United States, DOJ, the OIG, the BOP, and the FBI as defendants.  Proposed 2d Am. Compl. at 2–3, ECF No. 118-1.  In addition to individual defendants Dignam, Samuels, Anderl, Stroble, and N'Diaye, the Proposed Second Amended Complaint names Jose Santana, former Chief of the BOP's Designation and Sentence Computation Center, and Kerri Pistro, Andre Matevousian, and Elizabeth Stahl, each members of the BOP's Transgender Executive Counsel ("TEC").[3]  Proposed 2d Am. Compl. at 3.  The Proposed Second Amended Complaint retains Privacy Act claims but appears to drop the First Amendment claim.[4]  It purports to add new APA claims as well as claims under the Eighth Amendment, the Fifth Amendment, the Federal Tort Claims Act ("FTCA"), 28 U.S.C. 2671, *et seq*., and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*.  *Id.* at 2.

In the Proposed Second Amended Complaint, Pinson describes herself as a "M to F transgender federal prisoner."  *Id.* at 2.  She alleges that she has been diagnosed with gender dysphoria, suffers severe depression, anxiety, and neuropathic pain, and has attempted suicide and engaged in self-harm multiple times.  *Id.* at 20–21.  Pursuant to BOP Program Statement

---

[3] Santana allegedly was previously a member of the TEC.  Proposed 2d Am. Compl. at 3.

[4] The Proposed Second Amended Complaint also lists "Violation of the FOIA" under its "Statement of Claims" heading, but in a subsequent filing Pinson explained her Proposed Second Amended Complaint "drops" the FOIA claims.  Pl.'s Resp. Status Report at 1, ECF No. 135.

5200.04, the TEC governs placement of transgender inmates and oversees the management of their unique needs.  *See Driever v. United States*, No. CV 19-1807, 2020 WL 6135036, at *1 (D.D.C. Oct. 19, 2020).  In 2018, BOP amended Program Statement 5200.4 to provide that the "initial determination" of a transgender inmate's placement would be based on "biological sex." *Id.* (citation omitted); Proposed 2d Am. Compl. at 5.  This policy also directed the TEC to consider the health and safety of both transgender inmates and other inmates in the institution. *Driever*, 2020 WL 6135036, at *1.  Pinson claims that the changes meant transgender inmates would be placed in a facility appropriate for their self-identified gender only "in rare cases."  *See* Proposed 2d Am. Compl. at 6 (citation omitted).  Pursuant to Program Statement 5200.04, the TEC transferred Pinson from a facility in Missouri to Rochester in 2017, from Rochester to Tucson in 2018, and ultimately to Coleman.  Proposed 2d Am. Compl. at 4, 14, 22.  The TEC imposed the latter two placements over Pinson's objections; she requested a return to Rochester or a "female facility to address her medical, mental health, safety, and gender identity issues." *Id. at* 22.  At Rochester, she had received daily access to a psychologist, weekly psychiatric consultations, the attention of correctional staff trained to deal with mental health issues, treatment at the Mayo Clinic's field-leading Transgender Care Clinic, and access to electric shaving devices.  *Id.* at 9, 21.  All of this stopped once she left Rochester, and Pinson has since faced repeated "brutal assaults," sexual harassment, and abuse at the hands of other inmates.  *Id.* at 21.

Pinson alleges that the TEC transferred her to Tucson seven days after she refused Anderl's offer to stop threatening Pinson with a transfer away from Rochester in exchange for Pinson's signature on a document releasing BOP from any liability associated with her recent suicide attempt.  *Id.* at 13–14.  Once she was there, the Tucson warden thrice requested that

Pinson be transferred to "lesser security." *Id.* at 15.  The TEC denied these requests on the basis of three memoranda from the warden, each of which allegedly contained materially false statements claiming that Pinson possessed advanced computer skills, was an explosives expert, had compromised or bribed staff, and had a history of introducing drugs into prison facilities. *Id.* at 15–16.  Santana allegedly stated that the transfers were denied, and Pinson assigned "maximum custody status," based on an allegation that Pinson had thrown boiling oil into the face of a nurse at one of her previous facilities. *Id.* at 16.  According to Pinson, this never happened. *Id.*  Pinson complained about the sexual abuse she suffered at Tucson, but she alleges that OIG failed to act and that N'Diaye disabled her access to OIG's TRULINCS reporting system. *Id.* at 14–15.

Finally, the Second Amended Complaint alleges that Dignam, Samuels, Anderl, Stroble, N'Diaye, and other BOP employees engaged in a campaign to obstruct and impede OIG investigations and lawsuits Pinson filed against prison officials in courts across the country. Various of these defendants allegedly authorized the harassment, threatening, and bribing of witnesses; made false statements to federal courts; and blocked Pinson's access to currency to stop her from paying court fees.  Some of these actions, according to Pinson, violated federal criminal obstruction of justice and witness tampering statutes. *Id.* at 18–19.

Defendants filed an opposition to Pinson's motion for leave to amend, in which they argue that the Proposed Second Amended Complaint is untethered to the First Amended Complaint and that in any event, the claims in the Proposed Second Amended Complaint are futile.  Defs.' Opp'n Pl.'s Mot. Leave Amend Compl. at 2, ECF No. 126 ("Opp'n").  While this motion was pending, Pinson filed a motion alleging that a prison officer had confiscated her draft

response to the motion to dismiss and requesting sanctions. Pl.'s Mot. Sanctions and Return of Documents at 2, ECF No. 130.

### III. LEGAL STANDARDS

A plaintiff may amend a complaint "once as a matter of course" within 21 days of serving it or within 21 days of the filing of a responsive pleading. Fed. R. Civ. P. 15(a)(1). After that, a plaintiff may only amend with the written consent of the opposing party or with the court's leave. Fed. R. Civ. P. 15(a)(2). Courts should "freely give leave when justice so requires," *id.*, and "the party opposing the amendment bears the burden to show why leave should not be granted," *Connecticut v. U.S. Dep't of the Interior*, 363 F. Supp. 3d 45, 54–55 (D.D.C. 2019) (cleaned up). Still, "[w]here . . . the complaint, as amended, would radically alter the scope and nature of the case and bears no more than a tangential relationship to the original action, leave to amend should be denied." *De Sousa v. Dep't of State*, 840 F. Supp. 2d 92, 113 (D.D.C. 2012) (quoting *Miss. Ass'n of Coops. v. Farmers Home Admin.*, 139 F.R.D. 542, 544 (D.D.C. 1991)).

Moreover, "[c]ourts may deny a motion to amend a complaint as futile . . . if the proposed claim would not survive a motion to dismiss." *James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1099 (D.C. Cir. 1996) (citing *Foman v. Davis*, 371 U.S. 178,181–82 (1962)). Thus, courts determine futility by applying the standards for motions to dismiss under Federal Rule of Civil Procedure 12, including those applicable to motions to dismiss for failure to state a claim and those applicable to motions to dismiss for lack of personal jurisdiction. *See Woodruff v. United States*, 310 F. Supp. 3d 54, 56 (D.D.C. 2018); *Kurtz v. United States*, 798 F. Supp. 2d 285, 291 (D.D.C. 2011), *aff'd*, No. 11-5289, 2012 WL 1155801 (D.C. Cir. Mar. 1, 2012). Accordingly, a proposed amended complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also* Fed. R. Civ. P. 12(b)(6). Under this standard, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are insufficient to survive a motion to dismiss. *Id.* A court must accept the factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *See Twombly*, 550 U.S. at 555. However, a court need not accept a plaintiff's legal conclusions as true, *see Iqbal*, 556 U.S. at 678, nor must a court accept as true legal conclusions that are couched as factual allegations, *see Twombly*, 550 U.S. at 555.

A proposed amended complaint must also establish personal jurisdiction by alleging specific facts "connecting [each] defendant with the forum." *See First Chicago Int'l v. United Exch. Co.*, 836 F.2d 1375, 1378 (D.C. Cir. 1988) (internal quotation marks omitted); *see* Fed. R. Civ. P. 12(b)(2) (providing that a party may move to dismiss for lack of subject matter jurisdiction). While factual discrepancies in the record must be resolved in favor of the plaintiff, *see Livnat v. Palestinian Auth.*, 851 F.3d 45, 57 (D.C. Cir. 2017), a court is not required to accept as true the plaintiff's "conclusory statements" or "bare allegations" regarding the defendants' actions when conducting the personal jurisdiction analysis. *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1349 (D.C. Cir. 2000). The court may instead "receive and weigh affidavits and any other relevant matter to assist it in determining the jurisdictional facts." *United States v. Philip Morris, Inc.*, 116 F. Supp. 2d 116, 120 n.4 (D.D.C. 2000) (citation omitted). "When certain claims in the amended complaint are futile but other claims survive, courts have denied leave to amend in part with respect to the futile claims while allowing leave to amend in part with respect to the surviving claims." *Henok v. Chase Home Fin., LLC*, 915 F. Supp. 2d 109, 114 (D.D.C. 2013).

Finally, the Court notes that a pro se complaint is held to "less stringent standards than formal pleadings drafted by lawyers," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)), although it still must comply with the Federal Rules of Civil Procedure, *Jarrell v. Tisch*, 656 F. Supp. 237, 239 (D.D.C. 1987).  As a result, the Court considers Pinson's complaint "in light of" all of her filings.  *Cf. Brown v. Whole Foods Mkt. Grp., Inc.*, 789 F.3d 146, 152 (D.C. Cir. 2015) ("[A] district court errs in failing to consider a pro se litigant's complaint 'in light of' all filings, including filings responsive to a motion to dismiss.").

## IV.  ANALYSIS

### A.  The Court Denies Leave to Add APA, Fifth Amendment, and Eighth Amendment Claims

#### 1.  APA and Fifth Amendment Claims

"Where . . . the complaint, as amended, would radically alter the scope and nature of the case and bears no more than a tangential relationship to the original action, leave to amend should be denied."  *De Sousa*, 840 F. Supp. 2d at 113  (quoting *Miss. Ass'n of Coops.*, 139 F.R.D. 542, 544 (D.D.C. 1991)).  At their core, the APA, Fifth Amendment, and Eighth Amendment claims all assert that prison officials failed to provide adequate medical and safety services Pinson needed because of her status as a transgender individual.  These concerns relate only tangentially to Pinson's original action and would radically alter its scope.

Setting the FOIA claims aside, at the heart of the First Amended Complaint is a set of allegations that Anderl and other BOP officials retaliated against Pinson's First Amendment expression, including by causing her to be transferred from Rochester to Tucson in retaliation for Pinson's refusal to settle a lawsuit and by interfering with her litigation efforts.  Am. Compl. at

2.  In connection with this claim, Pinson sought damages.[5]  *Id.* at 3.  In stark contrast, Pinson's APA and Fifth Amendment claims against Program Statement 5200.04 seek sweeping, programmatic relief, namely an "[i]njunction enjoining BOP's use, execution of, enforcement, reliance upon the version of Program Statement 5200.04 as approved by defendant Mark Inch" and a declaratory judgment that "Program Statement 5200.04, as amended, violates the Equal Protection Clause of the Fifth Amendment and was amended for purposes of discrimination." Proposed 2d Am. Compl. at 22–23.  The First Amended Complaint does not so much as mention the Program Statement, much less level these sorts of facial attacks against it.

To be sure, the APA and Fifth Amendment challenges to Program Statement 5200.04 do relate in some sense to the same Rochester-Tucson transfer that grounded the First Amended Complaint.  The Proposed Second Amended Complaint alleges that "[p]ursuant to Program Statement 5200.04, defendants Pistro and Matevousian and Stahl, among others, as members of the TEC approved plaintiff['s] designation to and housing at USP Tucson and USP Coleman-2 as well as denying multiple requests to house her back at FMC Rochester, a lower security prison, or a female facility to address her medical, mental health, safety, and gender identity issues." *Id.* at 22.  Thus, in addition to her facial challenges, Pinson also requests individually tailored relief that arguably relates to her APA and Fifth Amendment claims: an "[i]njunction enjoining BOP from classifying plaintiff as less than Mental Health and Medical Care Level 3." *Id.* at 23.

But Pinson distinguishes between the alleged retaliatory transfer challenged in the First Amended Complaint (and further detailed in the Proposed Second Amended Complaint), and the Proposed Second Amended Complaint's addition of APA and Fifth Amendment challenges to

---

[5] The First Amended Complaint does list the APA as a cause of action, but does not explain the claim in any detail.  Am. Compl. at 1.

Program Statement 5200.04 and to the medical and safety treatment Pinson received as a transgender individual at Tucson.  In response to Defendants' claim that the substance of the Proposed Second Amended Complaint does not address an APA claim, Pinson writes that "[t]he proposed amended complaint alleges not just that she was retaliated against, but that the consequence of that retaliation combined with unconstitutional discrimination against transgender persons in the Trump Administrations [sic] rewriting of how the BOP defined sex is a denial of access to necessary and effective treatment of the plaintiff's gender dysphoria.  **It is not the transfer being challenged**, it is the collateral consequences thereof being challenged: denial of treatment."  Pl.'s Reply Defs.' Opp'n Pl.'s Mot. for Leave to Amend at 6, ECF No. 131 ("Reply") (underlining in original and bolding added).  The APA claims thus sound as a challenge to BOP decisions regarding her wellbeing as a transgender individual.  In contrast, other than the vague allegations that Rochester was "the only facility where [Pinson] has ever felt safe" and that "[t]he conditions at USP Tucson are remarkably harsher and more dangerous than those at FMC Rochester," the First Amended Complaint does not even mention Pinson's transgender status or any medical or safety complaints related to it; it focuses entirely on retaliation against and interference with Pinson's litigation efforts.  Am. Compl. at 2.

　　Pinson further characterizes her Fifth Amendment claims as "claims that high ranking BOP officials, and the Trump White House, were engaged in an across-the-government attack on Obama administration policies or practices that favored the rights of transgender persons to equal protection under the laws."  Reply at 7.  This is a broad challenge to the regulations governing transgender inmates, rather than to any retaliation against Pinson specifically.  It therefore relates to "different considerations by Defendants than the claims included in previous iterations of the complaint."  *Small Bus. in Transportation Coal. v. United States Dep't of Transp.*, No. CV 20-

883, 2021 WL 4399581, at *15 (D.D.C. Sept. 27, 2021).  The APA and Fifth Amendment claims

also require the addition of new defendants.  *Cf. Evans v. Thompson*, No. CV 14-13024, 2016

WL 2901729, at *2 (D. Mass. May 18, 2016).

Therefore, the Court denies leave to amend to add APA and Fifth Amendment claims.

"The interests of justice would not be served by allowing Pinson to assert [these] proposed

claims here, because the new claims do not involve the same evidence or substantially the same

legal issues as the existing claims . . . ."  *Pinson v. United States Dep't of Just.*, 246 F. Supp. 3d

211, 231 (D.D.C. 2017).

### 2.  Eighth Amendment Claims

Similarly, though both the First Amended Complaint's First Amendment retaliation

claims and the Eighth Amendment claims elaborated upon in the Proposed Second Amended

complaint relate in some sense to Pinson's transfer from Rochester to Tucson, the central facts

underlying these claims differ.[6]  The First Amendment claim would have turned on discussions

between Pinson and Anderl that took place while she was at Rochester; the question would have

been whether Pinson was transferred out of Rochester because of her protected conduct.  *See*

*Aref v. Holder*, 774 F. Supp. 2d 147, 169 (D.D.C. 2011).  By contrast, evaluation of the Eighth

Amendment claim detailed in the Proposed Second Amended Complaint would turn on the

---

[6] Defendants devote substantial argument to what they read as Pinson's *Bivens* claims for
First Amendment retaliation, Opp'n at 9–10,14–16, but the Court reads the Proposed Second
Amended Complaint to drop any First Amendment claims, *see* Proposed 2d Am. Compl. at 2
(listing FOIA, Privacy Act, APA, Eighth Amendment, FTCA, Fifth Amendment, and RICO
claims, but not First Amendment claims); Reply at 7 (arguing "that both the retaliation and
discrimination directly endangered [Pinson's] health and safety, and that such endangerment
violated the Eighth Amendment," but not mentioning any First Amendment claim).  In any
event, Defendants are correct that the *Bivens* cause of action does not extend to claims of First
Amendment retaliation, so any damages claims for First Amendment retaliation would be futile.
*Pinson v. U.S. Dep't of Just.*, 514 F. Supp. 3d 232, 245 (D.D.C. 2021).

adequacy of Pinson's treatment and access to medical care once she arrived at Tucson.  *See*

*Morrison v. Fed. Bureau of Prisons*, No. 19-CV-1838, 2021 WL 1209210, at *3 (D.D.C. Mar.

30, 2021) ("To establish a claim under the Eighth Amendment for denial of adequate medical

care while incarcerated, a plaintiff must show that he suffered from a serious medical need and

that prison officials were deliberately indifferent to that need." (citing *Estelle v. Gamble*, 429

U.S. at 103–04)).  Thus, Pinson's allegations in the Proposed Second Amended Complaint detail

several ways in which the treatment Pinson received for gender dysphoria and anxiety after the

Tucson transfer was inferior to the treatment she received in Rochester.  Proposed 2d. Am.

Compl. at 20–21.  She allegedly no longer received any access to a psychiatrist, did not receive

daily access to a psychologist, did not receive treatment at the Mayo Clinic, did not benefit from

staff specially trained to monitor mental health issues, and did not receive electric shaving

devices.  *Id.* at 21.  She has also allegedly been the victim of assaults and sexual harassment.  *Id.*

Pinson's allegedly insufficient treatment once she arrived at Tucson constitutes a separate

course of events than the allegedly retaliatory means by which she arrived there.  Moreover, the

First Amended Complaint does not contain *any* allegations related to the medical conditions of

Pinson's confinement (though it does allege that she was threatened with retaliatory solitary

confinement).  Am . Compl. at 2.  Therefore, the Court concludes that Pinson's Eighth

Amendment claims would unduly expand the scope of the original action and denies leave to

amend to add them.  *See Pinson*, 246 F. Supp. 3d at 231 ("These proposed amendments bear—at

most—a tangential relationship to Pinson's original claims.  The proposed and existing claims

are unconnected in time, the identity of the alleged perpetrator, [and] the BOP facility involved

. . . .); *Vasquez v. Whitney*, No. 916-CV-0623, 2018 WL 4702063, at *3 (N.D.N.Y. Sept. 28,

2018) (denying leave to amend a complaint alleging mistreatment during involuntary

commitment at a state psychiatric facility to add claims arising out of subsequent incarceration at different facility because the requested amendments "would constitute a wholesale reformation of [the plaintiff's] suit, with new defendants, new factual allegations, and new legal theories to be addressed."). Because the APA, Fifth Amendment, and Eighth Amendment claims are the only ones that relate to the TEC-member defendants—Santana, Pistro, Matevousian, and Stahl—the Court denies leave to add these defendants.[7]

In sum, the APA, Fifth Amendment, and Eighth Amendment claims raise distinct factual and legal issues and belong "in a separate lawsuit." *See Wolf v. C.I.A.*, 569 F. Supp. 2d 1, 11 (D.D.C. 2008). Indeed, Pinson is a three-striker under the Prison Litigation Reform Act, which means she has lost her ability to proceed in forma pauperis because she has, while incarcerated, brought three or more cases that have been dismissed as frivolous, malicious, or failing to state a claim. *See Pinson v. United States Dep't of Just.*, 964 F.3d 65, 68, 74 (D.C. Cir. 2020) (citing 28 U.S.C. § 1915(g)). The Court will not allow Pinson to circumvent the Prison Litigation Reform Act's requirement that she pay filing fees by cramming new, tangentially related claims into the instant lawsuit.

---

[7] Read liberally, Pinson's Proposed Second Amended Complaint might also seek to assert Privacy Act claims against these defendants in their official capacities. *See* Proposed 2d Am. Compl. at 15–17; *Ashbourne v. Hansberry*, 302 F. Supp. 3d 338, 346 (D.D.C. 2018) (holding that a plaintiff stated a Privacy Act claim against federal officials in their official capacities); *Earle v. Holder*, 815 F. Supp. 2d 176, 180 (D.D.C. 2011) (holding that the Privacy Act does not authorize claims against federal officials in their individual capacities), *aff'd*, No. 11-5280, 2012 WL 1450574 (D.C. Cir. Apr. 20, 2012). However, because the Court, as discussed below, grants Pinson leave to bring Privacy Act claims against the BOP, any official-capacity Privacy Act claims against the TEC members would be dismissed as duplicative of the Privacy Act claims against the BOP. *Cf. Placide Ayissi-Etoh v. Fannie Mae*, 49 F. Supp. 3d 9, 14 (D.D.C. 2014), *aff'd*, 621 F. App'x 677 (D.C. Cir. 2015).

### B.  The Court Grants Pinson's Remaining Amendment Requests

#### 1.  Claims Against Anderl

Defendants argue that to the extent the Proposed Second Amended Complaint seeks to add and expand upon claims against Anderl, it must be denied as futile because these claims could not withstand a motion to dismiss for lack of personal jurisdiction.  Opp'n at 6.  They rely solely on their affidavit, discussed above, stating that Anderl is employed in Rochester.  However, mindful of its obligation to construe pro se complaints liberally, the Court cannot conclude on this record that the Proposed Second Amended Complaint is futile due to a lack of personal jurisdiction over Anderl.

"A complaint can establish a basis for personal jurisdiction in two ways.  First, it can show general or all-purpose jurisdiction, which permits a court to hear any and all claims against the defendant. . . . Second, a complaint can allege specific or conduct-linked jurisdiction."  *Urquhart-Bradley v. Mobley*, 964 F.3d 36, 43–44 (D.C. Cir. 2020) (citations omitted and cleaned up).  "Where the defendant is an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile."  *Id.* at 43 (cleaned up).  Anderl has been employed at FMC Rochester—in Minnesota—since at least December 2014.  Decl. Deborah Locke ¶ 7, ECF No. 116-1.  Nothing in the record suggests any basis for the exercise of general personal jurisdiction over Anderl in the District of Columbia.

For specific personal jurisdiction, "(i) jurisdiction [must be] permissible under the forum state's long-arm statute, and (ii) the exercise of personal jurisdiction [must] comport[] with the Due Process Clause."  *Urquhart-Bradley*, 964 F.3d at 44.  As relevant here, the District of Columbia's long-arm statute permits jurisdiction over any claim arising from a person's "transacting any business in the District of Columbia."  D.C. Code § 13-423(a)(1).  The Fifth Amendment Due Process Clause requires "minimum contacts between the defendant and the

forum such that the defendant should reasonably anticipate being haled into court there.  That is, there must exist a relationship among the defendant, the forum, and the litigation such that the defendant's suit-related conduct creates a substantial connection with the forum."  *Urquhart-Bradley*, 964 F.3d at 44 (citation omitted and cleaned up).  A plaintiff can meet both the "transacting business" prong of the D.C. long-arm statute and the constitutional minimum contacts test by showing that an out-of-forum defendant participated in a conspiracy with residents of D.C. who took an overt act in furtherance of the conspiracy in D.C.[8]  *See Companhia Brasileira Carbureto de Calicio v. Applied Indus. Materials Corp.*, 640 F.3d 369, 372 (D.C. Cir. 2011); *Second Amend. Found. v. U.S. Conf. of Mayors*, 274 F.3d 521, 523–24 (D.C. Cir. 2001); *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1031 (D.C. Cir. 1997).  "In the District of Columbia, civil conspiracy has four elements: (1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme."  *Second Amend. Found.*, 274 F.3d at 524 (cleaned up).

Pinson alleges that "[Anderl] and Stroble did regularly advise BOP employees in means of obstructing or impeding litigation filed by the plaintiff, other inmates, and BOP employees, by

---

[8] Recent D.C. Circuit statements conflict on whether the D.C. long-arm statute's "transacting any busines" provision simply coextends with the Due Process Clause, *Urquhart-Bradley*, 964 F.3d at 44 (this provision provides 'jurisdiction to the full extent allowed by the Due Process Clause'") (citation omitted), or whether it imports an additional requirement that the defendant's forum contacts involve the transaction of business, *Collingsworth v. Drummond Co., Inc.*, 839 F. App'x 567, 568 (D.C. Cir. 2021) ("While it is true the 'transacting any business' provision reaches to the constitutional limit in cases where it applies, this means only that the provision 'covers any transaction of business in the District of Columbia that can be reached jurisdictionally without offending the Due Process Clause.'" (quoting *Mouzavires v. Baxter*, 434 A.2d 988, 990-93 (D.C. 1981) (alterations adopted)).

personally and by [sic] <u>conspiring</u> with others to engage in such behavior."  Proposed 2d Am. Compl. at 19 (emphasis added).  She further describes alleged "unlawful actions," including the transfer to Tucson, which "[Anderl] did, acting in concert with others, to harass, intimidate, impede, and obstruct plaintiff."  *Id.* at 18.  Construed liberally, the Proposed Second Amended Complaint alleges that Anderl participated with Dignam, Samuels, Lundy, N'Diaye, and Stroble in an unlawful plan to obstruct Pinson's litigation efforts and to retaliate against her.  *See id.* at 18–19.  Pinson alleges that actions taken in furtherance of this scheme included, among other things, the knowing submission of false statements to courts and instructions to threaten and bribe witnesses.  *Id.*  Anderl's alleged co-conspirators were all high-ranking BOP officials who presumably took any steps in furtherance of the conspiracy from D.C.—Samuels was the BOP Director, Dignam and N'Diaye held the position of Chief of BOP's Office of Internal Affairs, and Stroble works in the BOP general counsel's office.  Decl. Deborah Locke at 2.  We are also told that, during a dispute that arguably constituted part of the events leading up to the alleged retaliatory transfer to Tucson, Anderl "had regular telephonic and email contact with . . . BOP's attorneys in Washington, D.C."  Proposed 2d Am. Compl. at 8.  All of this might well be enough to establish personal jurisdiction based on a theory of conspiracy, but Defendants have not addressed such a theory.  Defendants, therefore, have not "not carried [their] burden of establishing that granting leave to amend the complaint would be futile" as it relates to personal jurisdiction over Anderl.  *See Mead v. City First Bank of DC, N.A.*, 256 F.R.D. 6, 8 (D.D.C. 2009).

## 2.  RICO Claims

The RICO claims in the Proposed Second Amended Complaint are more than tangentially related to allegations in the First Amended Complaint, and do not unduly expand the

scope of the action.  In addition to allegations related to the Rochester-Tucson transfer, the First

Amended Complaint alleges that Dignam and N'Diaye instructed BOP personnel to "discredit"

Pinson's OIG complaints so that Pinson could not use them in litigation and that the BOP

blocked Pinson from her email account to obstruct her from paying court filing fees, accessing

PACER, and communicating with her paralegal.  Am. Compl. at 2–3.  It further alleges that

Stroble filed materially false declarations against Pinson in court.  *Id.* at 3.  Just like the First

Amended Complaint, the RICO claims in the Proposed Second Amended Complaint allege a

campaign of interference with Pinson's litigation and administrative complaint activities:

Dignam and N'Diaye allegedly authorized the bribing and intimidation of witnesses during OIG

investigations and Stroble allegedly submitted false statements to federal courts in order to block

Pinson from accessing funds needed to pursue litigation.  Proposed 2d Am. Compl. at 18–19.

  Defendants argue that the RICO claims are futile because they would not survive a

motion to dismiss for failure to state a claim.  Opp'n at 19–20.  This may ultimately prove to be

the case, but Defendants have not met their leave-to-amend-stage burden of demonstrating

futility.  "RICO makes it 'unlawful for any person employed by or associated with any enterprise

engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or

participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of

racketeering activity or collection of unlawful debt.'"  *Cheeks v. Fort Myer Constr. Corp.*, 216 F.

Supp. 3d 146, 153 (D.D.C. 2016) (citing 18 U.S.C. § 1962(d)), *aff'd*, 728 F. App'x 12 (D.C. Cir.

2018).  Thus, "[t]he elements of a civil RICO violation are '(1) the conduct (2) of an enterprise

(3) through a pattern of racketeering activity.'"  *Id.* (quoting *Salinas v. United States*, 522 U.S.

52, 62 (1997)).

Defendants raise only two arguments in support of their contention that the RICO claims are futile; both relate to the third element.  "The RICO statute defines 'pattern of racketeering activity' as requiring the commission of at least two predicate racketeering offenses within a ten-year period." *Leonard v. George Washington Univ. Hosp.*, 273 F. Supp. 3d 247, 257 (D.D.C. 2017), *aff'd*, No. 17-5194, 2018 WL 3524644 (D.C. Cir. July 9, 2018).  Defendants first claim that Pinson's references to alleged "'indictable' acts, 'unlawful actions', and 'false statements', which primarily relate to her other litigation efforts, are far too vague to constitute racketeering activities and therefore cannot form the basis of a RICO claim."  Opp'n at 20 (citing Proposed 2d Am. Compl. at 18–19).  But the Proposed Second Amended Complaint does more than merely gesture at vague unlawful actions, it specifically alleges that Dignam, Samuels, Stroble, and N'Diaye "did intentionally commit acts which were and are indictable under sections 1503 [relating to obstruction of justice], 1510 [relating to obstruction of criminal investigations], and 1512 [relating to tampering with a witness, victim, or an informant] of Title 18 of the U.S. Code."  Proposed 2d Am. Compl. at 18.  18 U.S.C. § 1961(1) expressly lists each of these crimes as a valid predicate racketeering offense for the purpose of establishing a pattern of racketeering activity.  And Pinson alleges, with at least some specificity, actions that *might* have violated some of these statutes.  Anderl and Stroble allegedly submitted false statements to federal courts in order to prevent Pinson from accessing funds necessary to pursue litigation.  Proposed 2d Am. Compl. at 18; *see* 18 U.S.C. § 1512(c) (making it unlawful to "alter[], destroy[], mutilate[], or conceal[] a record, document, or other object, or attempt[] to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or . . . otherwise obstruct[], influence[], or impede[] any official proceeding, or attempt[] to do so").  Dignam and N'Diaye allegedly "authorized subordinates to harass, threaten, bribe, and intimidate witnesses in the

course of investigating" Pinson's OIG complaints.  Proposed 2d Am. Compl. at 19; *see* 18

U.S.C. § 1512(b)(1) (making it unlawful to "knowingly use[] intimidation, threaten[], or

corruptly persuade[], or attempt[] to do so, or engage[] in misleading conduct toward another

person with intent to . . . influence, delay, or prevent the testimony of any person in an official

proceeding").  The criminal RICO predicate statutes Pinson cites are complex, and the Court

does not take any position on whether these allegations (or others in the Proposed Second

Amended Complaint) plausibly plead violations of any of them.  They may well fail to do so—

Pinson does not, for example, seem to clearly identify any criminal proceeding that might bring

18 U.S.C. § 1510 into play.  18 U.S.C. § 1510(a) ("Whoever willfully endeavors by means of

bribery to obstruct, delay, or prevent the communication of information relating to a violation *of*

*any criminal statute* of the United States by any person *to a criminal investigator* shall be fined

under this title, or imprisoned not more than five years, or both." (emphases added)).  The point,

rather, is that Defendants' easy assertion that Pinson's allegations are "vague" does not fully

engage with the Proposed Second Amended Complaint or the elements of the predicate statutes.

Defendants remain free to do so by filing a motion to dismiss for failure to state a claim that does

so engage[9], but the Court will not evaluate the legal sufficiency of the RICO allegations in the

first instance without the benefit of briefing on the issues presented.  *Cf. Johnson v. Panetta*, 953

F. Supp. 2d 244, 250 (D.D.C. 2013).

Defendants' remaining argument—that 18 U.S.C. §§ 1503, 1510, and 1512 do not create

private rights of action—misses the point.  Opp'n at 20.  The Court does not understand Pinson

to rely on these statutes for a cause of action; instead, she seeks to rely on RICO's private right

---

[9] Of course, such a motion might also address the sufficiency of Pinson's pleadings on
the other elements of the RICO statute, i.e. the conduct of an enterprise.

of action and invokes these criminal statutes as racketeering predicates.  18 U.S.C. § 1964(c).

Once again, Defendants have not met their burden of establishing that the RICO claims are

futile, so the Court grants the motion to amend insofar as it relates to these claims.[10]

### 3. Privacy Act Claims

Defendants argue that the proposed amendment fails to state a claim for money damages

under the Privacy Act.  Opp'n at 18.  Before addressing Pinson's Privacy Act damages

allegations, the Court notes that the Proposed Second Amended Complaint also appears to

request injunctive relief under the Privacy Act.  Proposed 2d Am. Compl. at 22 (requesting an

injunction "enjoining BOP from maintaining false information in the Plaintiff's agency files").

The Privacy Act provides for injunctive relief to amend agency records in some circumstances.

5 U.S.C. § 552a(g)(1)(A).  Because Defendants have not addressed the issue of injunctive relief,

the Court grants the motion to amend to the extent it seeks to add a claim for injunctive relief

under the Privacy Act.  The Court will not *sua sponte* address any defects that may or may not be

present in Pinson's Privacy Act injunction allegations.  *See Hill v. U.S. Air Force*, 795 F.2d

1067, 1069 (D.C. Cir. 1986) (noting the Privacy Act's administrative exhaustion requirement for

amendment suits).

---

[10] The Court notes that Defendants have not suggested that Anderl, Dignam, N'Diaye, and
Stroble (or any other defendants) may not be the subject of a civil RICO suit because they are
federal officials.  Courts generally distinguish between RICO suits against federal officials in
their official capacities or against federal agencies, which may not be brought because of
sovereign immunity and because a federal agency is not chargeable with a predicate criminal
offense, and RICO suits against federal officials in their individual capacities.  When confronted
with latter, courts often treat the claim as cognizable and reach the merits or resolve it on the
basis of qualified immunity or on procedural grounds.  *See Brown v. Nationsbank Corp.*, 188
F.3d 579, 587 (5th Cir. 1999); *Abou-Hussein v. Mabus*, 953 F. Supp. 2d 251, 263, 265–66
(D.D.C. 2013); *Jenkins v. Kerry*, 928 F. Supp. 2d 122, 130 (D.D.C. 2013).

The Court likewise grants the motion to amend to the extent it seeks to add a damages claim under the Privacy Act.  "To state a claim for money damages under the Privacy Act, a plaintiff must assert that an agency failed to maintain accurate records, that it did so intentionally or willfully, and consequently, that an 'adverse' 'determination [wa]s made' respecting the plaintiff.  That is, the plaintiff must allege: inaccurate records, agency intent, proximate causation, and an 'adverse determination.'"  *Toolasprashad v. Bureau of Prisons*, 286 F.3d 576, 583 (D.C. Cir. 2002) (quoting 5 U.S.C. § 552a(g)(1)(C)).

Defendants argue that Pinson has failed to plead the first element because she "merely states without explanation or support" that the memoranda the TEC considered in relation to her transfer requests "'have no factual basis.'"  Opp'n at 18 (quoting Proposed 2d Am. Compl. at 16).  But all Pinson must do to plead the inaccurate records element is "challenge[] as false a specific assertion in the transfer memorandum that could, depending on the evidence, be easily ascertainable."  *Toolasprashad*, 286 F.3d at 583.  She has done this: she alleges that the memoranda falsely stated that she had advanced computer skills, was an explosives expert, had compromised or bribed staff, and had a history of introducing contraband into the BOP. Proposed 2d Am. Compl. at 15–16; *see Toolasprashad*, 286 F.3d at 583 (holding sufficient an allegation that a transfer memorandum falsely stated that the plaintiff had a "significant *documented* history of harassing and demeaning [prison] staff members" (citation omitted and emphasis original)).  She has also alleged that her transfers were based on a false allegation that Pinson attacked a nurse with boiling oil.  Proposed 2d Am. Compl. at 16.

Defendants next say that Pinson's allegations are too vague to establish causation, but it is unclear to the Court—and Defendants provide no authority to suggest—how Pinson could have been more specific at the pleading stage than alleging that the statements in warden-issued

memoranda requesting transfers "were used by the TEC to deny the 3 requests to send plaintiff to lesser security institutions."  Proposed 2d Am. Compl. at 15–16; *see also id.* at 16 ("BOP's TEC had been acting upon a fictional account of a brutal staff assault in [Pinson's] transfer decisions that <u>never even happened</u>" (emphasis in original)).

Defendants do not specifically address the remaining elements of Pinson's Privacy Act damages claims, and the allegations on these elements do not appear to the Court to be futile at the motion-to-amend stage.  The allegations of whole-cloth fabrication of misconduct charges might support an inference of intent.  *See Toolasprashad*, 286 F.3d at 584 (noting that an intentional violation is one that is "so patently egregious and unlawful that anyone undertaking the conduct should have known it unlawful").  And the transfer to Tucson and denials of desired transfers to a lesser-security institution were likely adverse determinations, especially considering Pinson's allegation that the deprivation of medical treatment at Tucson violated her Eight Amendment rights.  *Id.* (holding that a satisfactory allegation of a deprivation of constitutional rights suffices to plead an adverse determination (citation omitted)).  The Court reserves a definitive ruling on these issues, however, and Defendants remain free to address them in detail (and to raise any other issues they wish[11]) by filing a motion to dismiss the Second Amended Complaint.

### 4.  FTCA Claims

Defendants briefly assert that Pinson's FTCA "claims are never addressed in the substance of her complaint," so "she has plainly failed to state a claim under" the FTCA.  Opp'n at 3.  It is true that the Proposed Second Amended Complaint does not expressly mention any

---

[11] The Court notes in passing that certain categories of BOP records are exempt from the Privacy Act's damages provision.  *See* 28 C.F.R. § 16.97.

specific tort theories.  However, the Court must construe Pinson's pro se proposed amendment in light of all her filings, *see Brown*, 789 F.3d at 152, and she provides greater clarity in her reply brief: "the Body of the amended complaint details more than 15 pages of factual details alleging actions by federal employees that constitute negligence, assault, battery, intentional infliction of emotional distress."  Reply at 8.  Some of the allegations in the Proposed Second Amended Complaint *might* match up with some of these torts.  *See* Proposed 2d Am. Compl. at 13 (alleging that a BOP staff member threatened Pinson that if she did not stop filing complaints she could be transferred away from Rochester and explaining that this threat "had a deleterious effect on [Pinson's] mental health); *id.* at 14 (alleging that N'Diaye "did nothing to protect [Pinson] from a retaliatory transfer to USP Tucson threatened by" Anderl); *id.* at 15 (alleging that a BOP employee entered Pinson's cell, slapped her, punched her, and held her neck until she could no longer breathe and that N'Diaye and others refused to act upon Pinson's complaints about this and other incidents); *id.* at 19 (alleging that Dignam and N'Diaye refused to act upon Pinson's complaints of harassment or "acted in a manner not consistent with recognized or reasonable standards of an investigation").  Without the benefit of any response from Defendants to these allegations, the Court cannot at this stage conclude that the proposed amendment "does not adequately inform the court of the plaintiff's legal theory supporting" her FTCA claims.  *See Stone v. U.S. Embassy Tokyo*, No. CV 19-3273, 2020 WL 6746925, at *3 (D.D.C. Nov. 16, 2020) (citation omitted), *aff'd*, No. 20-5360, 2021 WL 2255016 (D.C. Cir. May 17, 2021).  Therefore, the Court grants leave to amend to the extent Pinson seeks to add FTCA claims.

***

The Court denies the motion to amend to the extent it brings APA, Fifth Amendment, and Eighth Amendment claims, but grants it with respect to all other claims discussed herein.

Accordingly, the Court denies leave to add Santana, Pistro, Matevousian, and Stahl as defendants. "For purposes of expediency, the Court shall simply direct the Clerk of the Court to accept" Pinson's Proposed Second Amended Complaint for filing, "with the understanding that" the APA, Fifth Amendment, and Eighth Amendment claims "are not viable." *See Council on Am.-Islamic Rels. Action Network, Inc. v. Gaubatz*, 891 F. Supp. 2d 13, 34–35 (D.D.C. 2012). The Court notes that there are no FOIA claims remaining in the case. *See* Pl.'s Resp. Status Report at 1, ECF No. 135 (noting that the Proposed Second Amended Complaint "drops" the FOIA claims). The Court further denies as moot the motion to dismiss the First Amended Complaint because the Second Amended Complaint is now the operative complaint. *See Erie Ins. Co. v. W.M. Barr & Co., Inc.*, 523 F. Supp. 3d 1, 5 (D.D.C. 2021); *Barrett v. Pepco Holdings*, 275 F. Supp. 3d 115, 118 (D.D.C. 2017).[12]

---

[12] The Court also denies Pinson's Motion for Sanctions and Return of Documents, ECF No. 130. In this filing, Pinson claims that while she was in the Special Housing Unit at USP Coleman-II, she prepared a response and collected associated evidentiary exhibits to file in opposition to the individual defendants' motion to dismiss. One day, Pinson claims, while she was out in the recreation yard, an Officer Parks entered her cell and confiscated her copy of the motion to dismiss, her draft response, and her collection of exhibits. Pl.'s Mot. Sanctions, and Return of Documents at 1, ECF No. 130. Pinson asks for an order directing BOP to return her legal papers, and, if the papers are not promptly returned, sanctions against Defendants in the form of denying the motion to dismiss and the imposition of compounding fines until the documents are returned. *Id.* at 3. In response, Defendants provide prison records and a declaration which cast serious doubt upon Pinson's claims. BOP rules require that confiscated inmate property be logged and stored in the confiscated property locker, but the Coleman confiscated property locker does not contain any of Pinson's property. Defs.' Opp'n Pl.'s Mot. Sanctions and Return of Documents, ECF No. 134, at 2. Moreover, BOP records show that Pinson did not leave her cell for recreation between her arrival at the SHU and the day she sent a letter to government counsel alleging that her property had been confiscated. *Id.* What is more, Officer Parks was not assigned to the SHU during that time period. *Id.*

Pinson appears to attempt her motion under Federal Rule of Civil Procedure 11, but this rule provides only for sanctions related to improper representations to courts. Pl.'s Mot. Sanctions, and Return of Documents at 2. Because Pinson alleges the destruction of evidence, the Court construes the sanctions motion as addressed to "its inherent authority to manage its affairs so as to achieve the orderly and expeditious disposition of cases." *See Clarke v. Washington Metro. Area Transit Auth.*, 904 F. Supp. 2d 11, 20 (D.D.C. 2012) (adjudicating a

Finally, the Court emphasizes once again that nothing in this opinion should be taken to suggest whether or not the Second Amended Complaint would in fact survive a motion to dismiss, either on grounds Defendants do not raise in their motion-to-amend opposition or based on expanded versions of arguments they do raise.  The Court will evaluate a motion to dismiss the Second Amended Complaint, if any is filed, if and when such a motion is fully briefed.

## V.  CONCLUSION

For the foregoing reasons, Pinson's Motion for Leave to File a Second Amended Complaint (ECF No. 118) is **GRANTED IN PART AND DENIED IN PART**.  Dignam, Samuels, Inch, Lundy, Stroble, and N'Diaye's Motion to Dismiss the First Amended Complaint (ECF No. 116) is **DENIED AS MOOT**.  Pinson's Motion for Sanctions and Return of Documents (ECF No. 130) is **DENIED**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  03/09/2022                                                          RUDOLPH CONTRERAS
                                                                                    United States District Judge

---

motion for sanctions based on alleged spoliation of evidence), *aff'd*, 540 F. App'x 3 (D.C. Cir. 2013).  Under this source of authority, the party seeking sanctions bears the burden of proving that sanctions are justified at least by a preponderance of the evidence.  *Id.* at 20–21.  Pinson did not respond to Defendants' opposition evidence within the seven-day window provided by Local Rule 7(d), so the Court is left to weigh Pinson's declaration in support of her sanctions motion against Defendants' declaration and documentary record.  Defendants' evidence undermines Pinson's account in several ways.  On this record, Pinson has not carried her burden of proving that sanctions are justified.