**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| JEREMY PINSON, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 18-486 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 146, 149, 150 |
| | : | | |
| U.S. DEPARTMENT OF JUSTICE, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

**MEMORANDUM OPINION**

**GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT;**
**DENYING PLAINTIFF'S MOTION TO FILE A SUPPLEMENTAL COMPLAINT; AND GRANTING IN**
**PART AND DENYING IN PART PLAINTIFF'S MOTIONS SEEKING AN EXTENSION OF TIME,**
**APPOINTMENT OF COUNSEL, SANCTIONS AGAINST DEFENSE COUNSEL AND DEFENDANTS, AND**
**A PRELIMINARY INJUNCTION**

**I.  INTRODUCTION**

Plaintiff Jeremy ("Grace") Pinson ("Pinson" or "Plaintiff"), proceeding *pro se*, challenges her[1] transfer from Federal Medical Center Rochester ("FMC Rochester") in Minnesota to United States Penitentiary, Tucson ("USP Tucson"), as well as other alleged mistreatment at the hands of prison officials during her incarceration.  In March 2022, this Court granted in part and denied in part Pinson's request to file a further amended complaint, allowing Pinson to bring certain new claims and expand upon existing ones while also disallowing her from bringing others. *Pinson v. U.S. Dep't of Just.*, No. 18-cv-486, 2022 WL 703924, at *4-11 (D.D.C. Mar. 9, 2022).[2]

---

[1] Pinson identifies using feminine pronouns, so the Court follows suit.  *See Pinson v. U.S. Dep't of Justice*, 246 F. Supp. 3d 211, 214 n.1 (D.D.C. 2017), *on recons.*, 514 F. Supp. 3d 232.

[2] Specifically, the Court did not permit Pinson to bring claims alleging violations of the Administrative Procedure Act, the Fifth Amendment, and the Eighth Amendment. *See Pinson*, 2022 WL 703924 at *11.  The Proposed Second Amended Complaint also listed "Violation of the FOIA" under its "Statement of Claims" heading, but in a subsequent filing, Pinson explained

As permitted by the Court, the Second Amended Complaint ("SAC") ultimately maintained claims arising under the Privacy Act, 5 U.S.C. § 552a; added claims alleging violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961, *et seq.*, and the Federal Torts Claim Act ("FTCA"), 28 U.S.C. 2671, *et seq.*; and dropped the First Amendment claims included in Pinson's original Complaint.  *See generally* SAC, ECF No. 138.

Following the Court's grant of leave to file the SAC, Defendants—the United States, various federal officials, and several federal agencies, including the Federal Bureau of Prisons ("BOP") and Department of Justice ("DOJ")—moved to dismiss Pinson's SAC.  In turn, Pinson has filed two additional motions seeking an extension of time to respond to Defendants' motion to dismiss, appointment of counsel, sanctions against defense counsel and Defendants, a preliminary injunction to enjoin certain disciplinary action, and leave to file a supplemental complaint.  The Court grants Pinson's request for an extension of time to file her opposition to Defendants' motion to dismiss *nunc pro tunc*, such that her opposition is deemed timely filed. For the reasons set forth below, however, the Court grants Defendants' motion to dismiss the SAC; denies Pinson leave to file a supplemental complaint; and denies the remainder of Pinson's motions seeking sanctions, a preliminary injunction, and the appointment of counsel.

## II.  BACKGROUND

The Court presumes familiarity with its prior opinions in this matter, which recounted the factual background of this case.  *See, e.g., Pinson v. Dep't of Justice*, No. 18-cv-486, 2018 WL 5464706, at *1–2 (D.D.C. Oct. 29, 2018); *Pinson v. Dep't of Justice*, No. 18-cv-486, 2020 WL

---

that her Proposed Second Amended Complaint "drops" the FOIA claims.  Pl.'s Resp. Status Report at 1, ECF No. 135.

1509517, at *2–13 (D.D.C. Mar. 30, 2020).  It thus confines its discussion here to the facts and procedural background necessary to resolve the motions at issue.

### A.  Defendants' Motion to Dismiss

On August 29, 2022, Defendants moved for dismissal of Pinson's SAC, which encompasses claims arising under RICO, the FTCA, and the Privacy Act.  First, Defendants assert that Pinson's RICO claims must fail because, among other reasons, she has not established the existence of an "enterprise" as required under RICO and has accordingly failed to state a claim for relief.  Defs.' Mot. to Dismiss at 8–10, ECF No. 146.  Second, Defendants contend that the Court should dismiss Pinson's FTCA claims given that she has not first administratively exhausted those claims and the Court thus lacks jurisdiction.  *See id.* at 11–13.  Third, Defendants argue Pinson's Privacy Act claims fail because, to the extent that the documents in question contain any inaccuracies, the documents are not even subject to the Privacy Act and cannot form the bases of alleged violations of that statute.  *See id.* at 14–17.

Pinson originally sought an extension of time to respond to Defendants' motion to dismiss.  *See* Pl.'s Mot. for Sanctions, Appointment of Counsel, and Enlargement of Time ("Pl.'s Mot. for Sanctions") at 2, ECF No. 149.  Pinson eventually filed her opposition to Defendant's motion to dismiss on January 17, 2023.  *See generally* Pl.'s Mem. Opp'n to Defs.' Mot. to Dismiss ("Pl.'s Opp'n Mot. to Dismiss"), ECF No. 154.  Defendants then filed a reply in further support of their motion to dismiss.  *See generally* Defs.' Reply Supp. Mot. to Dismiss, ECF No. 155.

### B.  Plaintiff's Motions

Pinson has several motions pending with this Court that raise a number of requests.  First, Pinson seeks leave to file a supplemental complaint to her SAC to re-assert a First Amendment

claim in light of alleged additional retaliation by Defendants and to remedy what she describes as a "clerical error."  Pl.'s Mot. for Prelim. Inj., Appt. of Counsel, and Leave to File Supp. Compl. ("Pl.'s Mot. for Prelim. Inj.") at 3, 16, ECF No. 150.  Pinson claims that she never intended to drop her First Amendment claims in her SAC; rather, she inadvertently included her Fifth Amendment claim twice and omitted her First Amendment claim, which should have been clear to this Court because it "plainly understood retaliation to be a theme through its reading of the proposed SAC" and "[r]etaliation falls under the First not Fifth Amendment[]."  *Id.* at 16.

Second, Pinson seeks a preliminary injunction to enjoin Defendants from taking certain disciplinary action against her, Pl.'s Mot. for Prelim. Inj. at 18, even though the relevant incident report has been expunged from Pinson's record, *see* Ex. A to Defs.' Opp'n Pl.'s Mot. for Prelim. Inj., ECF No. 153-1.  Third, Pinson seeks sanctions against both Defendants and defense counsel in this case.  Pinson requests the imposition of sanctions against Defendants for allegedly threatening her and certain witnesses in her cases.  *See* Pl.'s Mot. for Sanctions at 2.  She then also requests that the Court sanction defense counsel for allegedly filing a false declaration in this case.  *Id.*

Finally, two of Pinson's pending motions seek the appointment of counsel, *see* Pl.'s Mot. for Prelim. Inj. at 18; Pl.'s Mot. for Sanctions at 2—a request that this Court has denied repeatedly, *see, e.g.*, *Pinson*, 2018 WL 5464706, at *8–9; *Pinson v. Dep't of Justice*, No. 18-cv-486, 2019 WL 1284595, at *4 (D.D.C. Mar. 20, 2019); Min. Order (May 28, 2019); *Pinson*, 2020 WL 1509517, at *26–27.  Pinson asserts that COVID-19-related prison lockdowns, placement in the Special Housing Unit ("SHU"), and a lockdown due to a shooting at USP Tucson on November 13, 2022, have blocked her access to the law library, witnesses, legal files, pens, and paper in the "face of a dispositive motion."  *See* Pl.'s Mot. for Prelim. Inj. at 3-8, 18.

## III.  LEGAL STANDARDS

### A.  Motion to Dismiss for Failure to State a Claim

To meet the requirements of Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must contain "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  To survive a motion to dismiss, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).   In considering such a motion, a court must construe the complaint "liberally in the plaintiff's favor with the benefit of all reasonable inferences derived from the facts alleged."  *Stewart v. Nat'l Educ. Ass'n*, 471 F.3d 169, 173 (D.C. Cir. 2006) (citing *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)).  But "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient.  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).  Further, a court need not accept a plaintiff's legal conclusions as true, *see id.*, nor presume the veracity of legal conclusions that are couched as factual allegations, *see Twombly*, 550 U.S. at 555.

### B.  Motion to Dismiss for Lack of Subject Matter Jurisdiction

Federal courts are courts of limited jurisdiction, *see Gen. Motors Corp. v. Envtl. Prot. Agency*, 363 F.3d 442, 448 (D.C. Cir. 2004), and must therefore address jurisdiction as a "threshold matter," *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998).  To determine whether jurisdiction exists, a court may "undertake an independent investigation to assure itself of its own subject matter jurisdiction" and "consider facts developed in the record

beyond the complaint." *CFA Inst. v. Andre*, 74 F. Supp. 3d 462, 465 (D.D.C. 2014) (internal citations omitted). "Under Rule 12(b)(1), a plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence." *Grell v. Trump*, 330 F. Supp. 3d 311, 316 (D.D.C. 2018).

## C.  Motion for Leave to Amend or to File a Supplemental Complaint

Pursuant to the Federal Rules of Civil Procedure, a party may amend its pleading once as a matter of course within 21 days after serving it, or within a specified amount of time if the pleading is one to which a responsive pleading is required.  Fed. R. Civ. P. 15(a)(1).  In all other cases, a party may amend its pleading only with the opposing party's consent or the court's leave.  Fed. R. Civ. P. 15(a)(2).  Moreover, a court may, "[o]n motion and reasonable notice . . . [and] on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented."  *Id.* 15(d).

"Courts typically resolve motions to supplement under Rule 15(d) and motions to amend under Rule 15(a) via the same standard."  *Thorp v. District of Columbia*, 325 F.R.D. 510, 513 (D.D.C. 2018); *Banner Health v. Burwell*, 55 F.Supp.3d 1, 8 n.9 (D.D.C. 2014); *Wildearth Guardians v. Kempthorne*, 592 F.Supp.2d 18, 23 (D.D.C. 2008).  The decision to grant or deny leave to amend or supplement a complaint is "within the discretion of the district court, but leave 'should be freely given unless there is a good reason, such as futility, to the contrary.'" *Wildearth Guardians*, 592 F.Supp.2d at 23 (quoting *Willoughby v. Potomac Elec. Power Co.*, 100 F.3d 999, 1003 (D.C. Cir. 1996)).  In contemplating whether to grant leave, a court must take into consideration "(1) undue delay; (2) the movant's bad faith or dilatory motive; (3) repeated failures to cure deficiencies by amendments previously allowed; (4) undue prejudice to the opposing party by virtue of permitting an amendment; and (5) futility of the amendment." *Norris v. Salazar*, 746 F. Supp. 2d 1, 3 (D.D.C. 2010) (citing *Foman v. Davis*, 371 U.S. 178, 182

(1962)); *see also Wildearth Guardians*, 592 F.Supp.2d at 23.  A court should also be mindful that a *pro se* litigant's complaint should be "construed liberally and is held to 'less stringent standards than formal pleadings drafted by lawyers.'"  *Lemon v. Kramer*, 270 F. Supp. 3d 125, 133 (D.D.C. 2017) (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam)).

### D.  Motion for Preliminary Injunction

"[T]he decision to grant injunctive relief is a discretionary exercise of the district court's equitable powers."  *John Doe Co. v. Consumer Fin. Prot. Bureau*, 235 F. Supp. 3d 194, 201 (D.D.C. 2017) (quoting *Sea Containers Ltd. v. Stena AB*, 890 F.2d 1205, 1209 (D.C. Cir. 1989)).  A preliminary injunction is an "extraordinary remedy," and one is "never awarded as of right."  *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  A plaintiff who seeks a preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Id.* at 20.

### E.  Motion for Sanctions

"When rules alone do not provide courts with sufficient authority to protect their integrity and prevent abuses of the judicial process, the inherent power fills the gap."  *Shepherd v. Am. Broad. Companies, Inc.*, 62 F.3d 1469, 1474 (D.C. Cir. 1995) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991)).  Sanctions may be punitive or compensatory, but are compensatory only if "'calibrate[d] to [the] damages caused by' the bad-faith acts on which it is based."  *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 108 (2017) (quoting *Mine Workers v. Bagwell*, 512 U.S. 821, 834 (1994)).  Compensatory sanctions "are paid to the complainant, 'based upon evidence of complainant's actual loss.'"  *United States v. Two Gen. Electric Aircraft Engines*,

317 F. Supp. 3d 516, 520 (D.D.C. 2018) (quoting *United States v. United Mine Workers of Am.*, 330 U.S. 258, 304 (1947)).

"So-called 'issue-related sanctions'—those that are 'fundamentally remedial rather than punitive and do not preclude a trial on the merits'—require proof by a preponderance of the evidence." *Compton v. Alpha Kappa Alpha Sorority Inc.*, 938 F. Supp. 2d 103, 106 (D.D.C. 2013) (citation omitted).  By contrast, "[p]unitive sanctions  . . . require a district court to find *clear and convincing* evidence of misconduct." *Landmark Leg. Found. v. Envtl. Protec. Agency*, 82 F. Supp. 3d 211, 218 (D.D.C. 2015) (citation omitted and emphasis in original); *see also Compton*, 938 F. Supp. 2d at 106 ("Any 'fundamentally penal' sanctions—'dismissals and default judgments, as well as contempt orders, awards of attorneys' fees, and the imposition of fines'—require proof by clear and convincing evidence." (citation omitted)).  Actions that "'evince[ ] bad faith or an egregious disrespect for the Court or judicial process'" may justify punitive sanctions, including attorney's fee awards, fines, and contempt citations. *Hall v. Dept. of Homeland Sec.*, 219 F. Supp. 3d 112, 119 (D.D.C. 2016) (quoting *Ransmeier v. Mariani*, 718 F.3d 64, 68 (2d Cir. 2013)); *Landmark*, 82 F. Supp. 3d at 218.  Witness tampering may warrant punitive sanctions. *See, e.g.*, *Young v. Off. of U.S. Sen. Sergeant at Arms*, 217 F.R.D. 61, 67–68 (D.D.C. 2003).

### F.  Motion for Appointment of Counsel

"Plaintiffs in civil cases do not have a constitutional right to counsel." *Beaulieu v. Holder*, No. CV 15-896, 2015 WL 13919718, at *1 (D.D.C. Dec. 2, 2015) (quoting *Willis v. FBI*, 274 F.3d 531, 532–33 (D.C. Cir. 2001)).  But this Court is authorized "to appoint counsel for parties who are unable to afford representation." *Id.* (citation omitted).  To evaluate a request for

the appointment of counsel, the Court turns to Local Civil Rule 83.11, which outlines four

factors to consider:

> (i) the nature and complexity of the action;
> (ii) the potential merit of the pro se party's claims;
> (iii) the demonstrated inability of the pro se party to retain counsel by other means; and
> (iv) the degree to which the interests of justice will be served by appointment of counsel, including the benefit the court may derive from the assistance of the appointed counsel.

*Id.* (quoting D.D.C. Civ. R. 83.11(b)(3)); *see also Gaviria v. Reynolds*, 476 F.3d 940, 943 (D.C.

Cir. 2007) (stating that Local Civil Rule 83.11 provides the "metric for evaluating appointment

of counsel").

## IV.  ANALYSIS

### A.  Defendants' Motion to Dismiss

Defendants have moved to dismiss Pinson's SAC.  As an overarching objection to

Defendants' motion to dismiss, Pinson contends that the motion ought to be "summarily denied

as redundant and repetitive" because the Court already "addressed failure to state a claim,

maliciousness and frivolousness" in allowing her to file her SAC.  Pl.'s Opp'n Mot. to Dismiss at

1.  But Pinson misunderstands the standard applied by the Court in its prior opinion, which

merely considered whether it would be futile to allow Plaintiff to amend her complaint.  *See*

*Pinson*, 2022 WL 703924, at *3 (detailing applicable legal standard for motions to amend).  The

Court explicitly reserved a definitive ruling on these issues.  *See, e.g.*, *id.* at *8 (noting that it

may "ultimately prove to be the case" that Pinson's claims would fail to survive a motion to

dismiss for failure to state a claim, but that Defendants had not "met their leave-to-amend-stage

burden of demonstrating futility"); *id.* at *10 ("The Court reserves a definitive ruling on these

[Privacy Act] issues, however, and Defendants remain free to address them in detail (and to raise

any other issues they wish) by filing a motion to dismiss the Second Amended Complaint.").
The Court addresses Defendants' arguments and grants Defendants' motion to dismiss the SAC.

### 1. RICO

RICO "imposes criminal and civil liability upon those who engage in 'a pattern of racketeering activity' defined as 'any act or threat involving' specified state-law crimes, acts indictable under various specified federal statutes, and other federal offenses." *Brown v. Nationsbank Corp.*, 188 F.3d 579, 587–88 (5th Cir. 1999) (quoting 18 U.S.C. § 1961(1)).  Under RICO, it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." *Cheeks v. Fort Myer Constr. Corp.*, 216 F. Supp. 3d 146, 153 (D.D.C. 2016) (quoting 18 U.S.C. § 1962(d)), *aff'd*, 728 F. App'x 12 (D.C. Cir. 2018). "[A] private party who has . . . sustained damages from a RICO violation" may recover damages under Section 1964(c) of RICO.  *Brown*, 188 F.3d at 588.  To allege a civil RICO violation, a plaintiff must establish three elements: "(1) the conduct (2) of an enterprise (3) through a pattern of racketeering activity." *Cheeks*, 216 F. Supp. 3d at 153 (quoting *Salinas v. United States*, 522 U.S. 52, 62 (1997)).

In this case, Pinson alleges that Defendants Dignam, Samuels, Anderl,[3] Stroble, and N'Diaye "did intentionally commit acts which were and are indictable" under 18 U.S.C. §§ 1503, 1510, and 1512.  SAC at 18.  Pinson claims that "BOP employees took unlawful actions . . . acting in concert with others, to harass, intimidate, impede, and obstruct [P]laintiff." *Id.*

---

[3] Defendant Kara Anderl, *née* Lundy, whom Plaintiff identifies as "Lundy" throughout the SAC, is identified here as "Anderl" per Defendants' motion to dismiss.  *See* Defs.' Mot. to Dismiss at 7 n.4.

Specifically, Pinson asserts that Defendant Anderl, counsel for BOP, was angered by Pinson's refusal to sign a settlement agreement; called her a "devious son of a bitch," "promised to derail any settlement [P]laintiff would ever attempt;" screamed, "[Y]ou like it here?  Well, you are gone, that's a promise;" and ripped up the settlement agreement.  *Id.* at 7–8.

Pinson further claims that Anderl had "regular telephonic and email contact with [Plaintiff's] and BOP's attorneys," and states that Anderl told Plaintiff she recommended that BOP deny a media interview requested with Pinson.  *Id.* at 8.  Moreover, Pinson asserts that in February 2018, Anderl told Plaintiff: "I told you when you got me in trouble over that settlement agreement that I was going to get you shipped . . . but maybe we can stop the tit for tat if you sign these."  *Id.* at 13.  According to Pinson, Anderl then gave Pinson two memoranda "stating [Plaintiff] wished to waive any liability of the BOP for her Jan. 12, 2018 suicide attempt."  *Id.*  Pinson contends that, after she declined to sign the memoranda, Anderl "signed and mailed" eight denials of Pinson's FTCA claims.  *Id.*  Pinson then also states that, seven days after this conversation with Anderl, she was transferred to USP Tucson, a "High Security facility with a predominantly sex offender population, by the [Transgender Executive Council ("TEC")] in BOP's Central office."  *Id.* at 14.

Next, Pinson maintains that Anderl and Stroble also blocked Plaintiff from accessing "her property . . . to prevent [P]laintiff from paying court filing fees" by making "false statements to federal courts to prevent [P]laintiff from acquiring court orders to remove limitations on her access to her property."  *Id.* at 18.  Per Plaintiff, Anderl and Stroble "did regularly advise BOP employees in means of obstructing or impeding litigation filed by [Plaintiff], other inmates, and BOP employees" both personally and "by conspiring with others to engage in such behavior."  *Id.* at 19.

With respect to Defendants N'Diaye and Dignam, Pinson claims that they knew she had "submitted complaints of harassment, intimidation, and retaliation to the Inspector General," but despite receiving her complaints, N'Diaye and Dignam "either failed to act, acted in a manner not consistent with recognized or reasonable standards of an investigation, and authorized subordinates to [harass], threaten, bribe and intimidate witnesses in the course of investigating the . . . OIG complaints[.]"  *Id.* at 19.  Specifically, N'Diaye did not "protect [P]laintiff from a retaliatory transfer to USP Tucson threatened by [Anderl]," disabled Pinson's "'DOJ Sexual Abuse Reporting' and OIG reporting function within TRULINCS," and further "act[ed] in concert" with an OIG employee "to block inquiry into any complaint filed by [P]laintiff."  *Id.* at 14 (emphasis omitted).

Pinson's claims under RICO must fail because Pinson has not alleged the existence of an "enterprise," one of the three elements necessary to allege a civil RICO violation.  *See Cheeks*, 216 F. Supp. 3d at 153.  RICO defines "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  An association-in-fact enterprise "is 'a group of persons associated together for a common purpose of engaging in a course of conduct,'" and "must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose."  *Boyle v. United States*, 556 U.S. 938, 946 (2009) (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)).  But "the members of a RICO enterprise must be 'distinct'—that is, 'one must allege and prove the existence of two distinct entities: (1) a person; and (2) an enterprise that is not simply the same person referred to by a different name.'"  *US Dominion, Inc. v. MyPillow, Inc*., No. 21-cv-0445, 2022 WL 1597420, at *5 (D.D.C. May 19, 2022)

(quoting *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 158 (2001)) (cleaned up).

Stated differently, "[t]he 'enterprise' complained of in a civil RICO action must be 'distinct from

those persons or entities who stand accused of conducting that racketeering activity.'"  *In re

Residential Cap., LLC*, 507 B.R. 477, 495 (Bankr. S.D.N.Y. 2014) (citation omitted); *see also

Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 162 (2001) (agreeing that 18 U.S.C. §

1962(c) requires "some distinctness between the RICO defendant and the RICO enterprise");

*Allstate Ins. Co. v. Rozenberg*, 590 F.Supp.2d 384, 390 (E.D.N.Y. 2008) ("However, under

Section 1962(c), it is well-established that the alleged 'enterprise' through which a pattern of

racketeering activity is conducted must be distinct from those persons or entities who stand

accused of conducting that racketeering activity.").

　　　As alleged, Pinson's claims do not establish the existence of an enterprise distinct from

Defendants Dignam, Samuels, Anderl, Stroble, and N'Diaye.  To the extent that Pinson argues

that BOP itself is the enterprise, "[a] federal agency does not constitute an enterprise for RICO

purposes."  *Franco v. City & Cnty. of San Francisco*, No. C 10-04768 WHA, 2012 WL 1980799,

at *11 (N.D. Cal. June 1, 2012).  And to the extent that she instead argues that certain

Defendants formed various association-in-fact enterprises, she has not alleged sufficient *facts* to

establish that these Defendants had a "common purpose of engaging in a course of conduct"

necessary for establishing such an enterprise.  *Boyle*, 556 U.S. at 946 (citation omitted).

　　　Consider, for instance, the requirements for the establishment of an association-in-fact

enterprise as set out by another court in this District in *MyPillow*, wherein a defendant alleged in

part that counter- and third-party defendants had violated RICO and "had the 'common purpose

of suppressing speech and dissent to the use of electronic voting machines and suppressing

demands for investigations into the possible use of electronic voting machines to artificially

manipulate voting, vote tabulations, and election results reporting'" in a presidential election. 2022 WL 1597420, at *4 (citation omitted).  The court rejected the premise that two of the entities—Dominion and Smartmatic—had "the requisite common purpose" for an association-in-fact enterprise when defendant had "allege[d] no fact raising an inference that Smartmatic worked with Dominion . . . 'to pursue by common, coordinated efforts what they could not do on their own.'"  *Id.* at *5 (citation omitted).  The defendant "also [did] not allege that Smartmatic communicated, met, or otherwise coordinated with Dominion . . . in furtherance of their supposed 'suppressive' aims," and "offer[ed] no allegations from which to infer a 'continuing unit that functions with a common purpose.'"  *Id.* (citation omitted).  The companies' shared corporate history "in no way suggest[ed] that the two companies 'joined together' to achieve an alleged illegal purpose," the court stated, and the defendant's complaint "contain[ed] no allegation that Dominion and Smartmatic did anything to coordinate their supposedly illegal 'lawfare' campaign."  *Id.*

Comparably, Pinson claims merely that "if defendants did not enjoy specific involvement inside the BOP they could not have committed the acts they did at all. . . . It is only their connection together that took their intentions beyond theoretical and into reality."  Pl.'s Opp'n Mot. to Dismiss at 4–5; *see also id.* at 4 ("The defendants are clearly identified as a group of individuals within the BOP misusing official powers.").[4]  But Pinson offers only vague

---

[4] In arguing in support of the existence of an enterprise, Pinson also says, "Private citizens cannot, alone, use governmental powers to retaliate against someone confined within a federal prison they cannot even enter without BOP consent.  Only BOP actors could have done so."  Pl.'s Opp'n Mot. to Dismiss at 5.  Her statement appears to suggest that she has filed suit against the individual Defendants here in their official capacities.  If correct, sovereign immunity would provide an additional basis for dismissing Pinson's RICO claim.  *See, e.g.*, *Fogle v. Walton-Pratt*, 318 F. Supp. 3d 114, 121 (D.D.C. 2018); *Mack v. Roberts*, No.08-cv-0310, 2008 WL 501383, at *1 (D.D.C. Feb. 25, 2008).  However, because it is unclear whether Pinson

accusations that certain Defendants acted together and that they may have communicated with other BOP employees.  She makes no specific factual allegations showing that these Defendants "communicated, met, or otherwise coordinated" with one another "in furtherance of their . . . aims," or "joined together" to achieve some common purpose.  *MyPillow*, 2022 WL 1597420, at *5 (citation omitted).  In short, Pinson's SAC sets forth only "conclusory and 'the-defendant-unlawfully-harmed-me' accusations" that "are not sufficient to comply with the requirements of Rule 8(a) or to make out a claim for a RICO enterprise."  *Cheeks v. Ft. Myer Constr. Corp.*, 71 F. Supp. 3d 163, 171 (D.D.C. 2014).

Accordingly, absent facts alleging an enterprise, Pinson's SAC is insufficient "to state a claim to relief that is plausible on its face" under RICO.  *Twombly*, 550 U.S. at 570.  The Court therefore dismisses Pinson's RICO claims for failure to state a claim and does not need to address Defendants' other arguments as to why Pinson's RICO claims should be dismissed.

## 2.  FTCA

"Under the FTCA, plaintiffs may sue the United States in federal court for state-law torts committed by government employees within the scope of their employment."  *Stoddard v. U.S. Parole Comm'n*, 900 F. Supp. 2d 38, 41 (D.D.C. 2012) (quoting *Harbury v. Hayden*, 522 F.3d 413, 416 (D.C. Cir. 2008)).  As the Court noted in its prior related opinion, Pinson's SAC "does not expressly mention any specific tort theories."  *Pinson*, 2022 WL 703924, at *10.  Pinson explicitly names only two purported tort claims in the SAC—TRT-NCR-2018-0691 and TRT-NCR-2018-02200, *see* SAC at 10—but claims that "the Body of the amended complaint details more than 15 pages of factual details alleging actions by federal employees that constitute

---

intended to sue the individual Defendants in their official capacities, and given her status as a *pro se* plaintiff, the Court does not dismiss her RICO claim solely on these grounds.

negligence, assault, battery, intentional infliction of emotional distress," Pl.'s Reply Defs.'
Opp'n Pl.'s Mot. for Leave to Amend at 8, ECF No. 131.

Even under a generous reading of Pinson's SAC to identify possible cognizable tort
claims, however, this Court lacks subject matter jurisdiction over Pinson's FTCA claims because
she has not shown that she exhausted her administrative remedies. *See* 28 U.S.C. § 2675(a);
*Norton v. United States*, 530 F. Supp. 3d 1, 5–6 (D.D.C. 2021). Contrary to Pinson's arguments
otherwise, *see* Pl.'s Opp'n Mot. to Dismiss at 6–7, a plaintiff bears the burden of proving the
exhaustion of administrative remedies, which "is a jurisdictional prerequisite to filing an FTCA
lawsuit," *Stoddard*, 900 F. Supp. 2d at 41. In addition, "[d]espite the favorable inferences that a
plaintiff receives on a motion to dismiss, it remains the plaintiff's burden to prove subject matter
jurisdiction by a preponderance of the evidence." *Norton*, 530 F. Supp. 3d at 4–5.

A plaintiff seeking to bring a suit under the FTCA must first have "presented the claim to
the appropriate Federal agency and his claim shall have been finally denied by the agency in
writing and sent by certified or registered mail." 28 U.S.C. § 2675(a); *McNeil v. United States*,
508 U.S. 106, 113 (1993) ("The FTCA bars claimants from bringing suit in federal court until
they have exhausted their administrative remedies."). That is, exhaustion occurs under the
FTCA "once a claimant has presented the appropriate federal agency with a claim describing the
alleged injury with particularity and setting forth a sum certain of damages and the agency has
(1) denied the claim in writing or (2) failed to provide a final disposition within six months of the
claim's filing." *Chien v. United States*, No. 17-cv-2334, 2019 WL 4602119, at *7 (D.D.C. Sept.
23, 2019) (quoting *Cureton v. U.S. Marshal Serv.*, 322 F. Supp. 2d 23, 26–27 (D.D.C. 2004)).
Where a plaintiff has not exhausted administrative remedies before filing a civil FTCA action,

the court must dismiss for lack of subject matter jurisdiction.  *See Jackson v. United States*, 248 F. Supp. 3d 167, 170–71 (D.D.C. 2017).

Pinson has not met her burden of proving exhaustion of administrative remedies.  Pinson implies that she may have filed at least eight FTCA claims because she asserts that, on February 8, 2018, Defendant Anderl "signed and mailed [eight] denials of FTCA claims [P]laintiff had filed."  SAC at 13.  Yet her SAC names only two purported tort claims—TRT-NCR-2018-0691 and TRT-NCR-2018-02200—and provides an alleged quotation from the former and no details about the latter.  *See id.* at 10, 13.  Pinson does not provide any evidence as to the submission of the claims: she does not allege presentment of her claims with the requisite particularity and a sum certain of damages to the BOP, or indicate which purported FTCA claims Defendant Anderl allegedly denied.  *See id.*  She does not allege that she filed "(1) a written statement sufficiently describing the injury to enable the agency to begin its own investigation, and (2) a sum-certain damages claim."  *Jackson*, 248 F. Supp. 3d at 171 (quoting *GAF Corp. v. United States*, 818 F.2d 901, 919 (D.C. Cir. 1987)).  Nor does she allege "submitting anything that would have allowed the agency to investigate her claim and determine whether to engage in settlement negotiations."  *Id*.  Because Pinson has therefore failed to meet her burden of proving administrative exhaustion, the Court dismisses Pinson's FTCA claims for lack of subject matter jurisdiction.[5]

---

[5] The Court notes further that the FTCA provides that a "tort claim against the United States shall be forever barred unless . . .  action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented."  28 U.S.C. § 2401(b); *see also United States v. Wong*, 575 U.S. 402, 405 (2015).  The Court does not assess whether Pinson's FTCA claims would be time-barred, in part because the FTCA's time limits are subject to equitable tolling.  *See Wong*, 575 U.S. at 420. But the Court observes that, even if Defendant Anderl's alleged actions in February 2018 sufficed for exhaustion of Pinson's remedies—a question that the Court need not reach here— Pinson only raised her FTCA claims over three years after their denials were purportedly mailed. Absent equitable tolling, these FTCA claims would be overdue and time-barred.

### 3. Privacy Act

The Privacy Act "places certain requirements on federal agencies maintaining 'system[s] of records . . . from which information is retrieved by the name of the individual . . . .'" *Scott v. Conley*, 937 F. Supp. 2d 60, 77 (D.D.C. 2013) (quoting 5 U.S.C. § 552a(a)(5)). "[T]he Act limits disclosure without an individual's consent, requires agencies to keep an accurate accounting of certain disclosures and to make such accounting available to an individual upon request, provides for individual access to and modification of records, and sets forth additional rules for agency maintenance of records." *Id.* (internal citations omitted). Federal agencies are required under the Privacy Act to "maintain all records which are used by the agency in making any determination about any individual with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination." 5 U.S.C. § 552a(e)(5); *see also Bartel v. F.A.A.*, 725 F.2d 1403, 1407 (D.C. Cir. 1984) ("The Privacy Act safeguards the public from unwarranted collection, maintenance, use and dissemination of personal information contained in agency records . . . by allowing an individual to participate in ensuring that his records are accurate and properly used, and by imposing responsibilities on federal agencies to maintain their records accurately." (footnotes omitted)). As defined by the Privacy Act, "record" means "any item, collection, or grouping of information about an individual that is maintained by an agency[.]" 5 U.S.C. § 552a(a)(4). Further, a "system of records" means "a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual." *Id.* § 552a(a)(5).

Section (g) of the Privacy Act denotes circumstances "under which an individual may bring a civil cause of action against a federal agency." *Dick v. Holder*, 67 F. Supp. 3d 167, 175

(D.D.C. 2014) (citing 5 U.S.C. § 552a(g)(1)(A)-(D)).  This section of the Privacy Act states in

relevant part:

> (g)(1) Civil remedies.—Whenever any agency
>> (A) makes a determination under subsection (d)(3) of this section not to amend an
>> individual's record in accordance with his request . . . ;
>> (C) fails to maintain any record concerning an individual with such accuracy,
>> relevance, timeliness, and completeness as is necessary to assure fairness in any
>> determination relating to the . . . rights . . . or benefits to the individual that may
>> be made on the basis of such record . . . ; or
>> (D) fails to comply with any other provision of this section . . . in such a way as to
>> have an adverse effect on an individual
>
> the individual may bring a civil action against the agency, and the district courts of the
> United States shall have jurisdiction in the matters under the provisions of this
> subsection.
> (2)(A) In any suit brought under the provisions of subsection (g)(1)(A) of this section, the
> court may order the agency to amend the individual's record . . . .
> (4) In any suit brought under the provisions of subsection (g)(1)(C) or (D) of this section
> in which the court determines that the agency acted in a manner which was intentional or
> willful, the United States shall be liable to the individual in an amount equal to the sum
> of—
>> (A) actual damages . . . ; and
>> (B) the costs of the action together with reasonable attorney fees . . . .

5 U.S.C. § 552a(g).  Thus, limited injunctive relief is available under the Privacy Act

"in suits to amend a record."  *Richardson v. Bd. of Governors of Fed. Reserve System*, 288 F.

Supp. 3d 231, 238 (D.D.C. 2018).  For suits brought under subsection (g)(1)(A) of the Act, "the

district court [may] undertake de novo review of the agency's amendment decision and

to order the agency to amend the challenged records where appropriate."  *Doe v. F.B.I.*, 936 F.2d

1346, 1350 (D.C. Cir. 1991) (citing 5 U.S.C. § 522a(g)(2)(A)).

In turn, claims for monetary damages may only be brought under "§ 552a(g)(1)(C) for

failure to maintain accurate records, and § 552a(g)(1)(D) for failure to comply with other

provisions of the Privacy Act if the agency acted intentionally or willfully."  *Dick*, 67 F. Supp.

3d at 175.  With respect to a claim made under § 552a(g)(1)(C), "a plaintiff must assert that an agency failed to maintain accurate records, that it did so intentionally or willfully, and consequently, that an adverse determination was made respecting the plaintiff." *Toolasprashad v. Bureau of Prisons*, 286 F.3d 576, 583 (D.C. Cir. 2002) (cleaned up).  "An agency acts in an intentional or willful manner 'either by committing the act without grounds for believing it to be lawful, or by flagrantly disregarding others' rights under the Act.'" *Deters v. U.S. Parole Comm'n*, 85 F.3d 655, 660 (D.C. Cir. 1996) (quoting *Albright v. United States*, 732 F.2d 181, 189 (D.C. Cir. 1984)).  In other words, the violation must be "so patently egregious and unlawful that anyone undertaking the conduct should have known it unlawful." *Toolasprashad*, 286 F.3d at 584 (quoting *Deters*, 85 F.3d at 660).  Notably, however, the Privacy Act also allows agencies to promulgate rules and exempt systems of records from certain provisions of the Privacy Act. *See* 5 U.S.C. § 552a(j); *see also, e.g.*, *Brown v. Fed. Bureau of Prisons*, 602 F. Supp. 2d 173, 175 (D.D.C. 2009).

Pinson raises Privacy Act claims arising from three sets of allegedly false records.  First, Pinson asserts that, after the TEC transferred her to USP Tucson on February 5, 2018, three memoranda "used by the TEC to deny . . . [three] requests to send [P]laintiff to lesser security institutions" stated inaccurately that Pinson had advanced computer skills, was an explosives expert, had compromised or bribed staff, and had a history of introducing contraband into BOP.[6] SAC at 15–16.  Second, the Court understands Pinson to claim that, in seeking summary

---

[6] Pinson also appears to describe these memoranda as requests from the USP Tucson warden to transfer her to lesser security institutions.  *See* SAC at 15.  Defendants similarly describes these memoranda as transfer request documents.  *See* Defs.' Mot. to Dismiss at 14.  In responding to Defendants' motion to dismiss, Pinson echoes Defendants' descriptions of these memoranda as "transfer requests."  Pl.'s Opp'n Mot. to Dismiss at 9.  Accordingly, the Court understands the three memoranda to be transfer requests.

judgment before this Court, BOP attorneys previously submitted the testimony given by Jose

Santana, the Chief of BOP's Designation and Sentence Computation Center, during a 2019

deposition, in which Santana stated that Pinson's maximum custody status and transfers were

based on her assault of a nurse.  *Id.* at 16.  According to Pinson, the assault never happened, and

the submission of this testimony constituted "the use of false information in agency records by

the BOP to gain unfair advantage in litigation."  *Id.* at 16–17.  Third, Pinson alleges that, as part

of another lawsuit in the Middle District of Pennsylvania, "BOP employees manufactured false

records" to show that Pinson had received employment as agreed upon in their settlement, in

order to oppose enforcement or vacatur of the settlement.  *Id.* at 17.[7]

As noted in the Court's prior opinion in this matter, the Court understands Pinson to seek

both injunctive relief and damages under the Privacy Act.  *Pinson*, 2022 WL 703924, at *9; *see*

SAC at 22 (seeking "[i]njunction enjoining BOP from maintaining false information in the

Plaintiff's agency files, said falsehoods to be determined at trial or by stipulation for

identification/expungement").

### a.  Transfer Memoranda

Pinson's claims for injunctive relief and damages arising from the alleged falsehoods

contained in the three transfer memoranda must fail because the BOP has exempted such files

from the Privacy Act's amendment and the civil remedies provisions.  As Defendants aver, BOP

transfer request records are maintained in BOP's Inmate Central Records System ("Inmate

---

[7] Defendants contend that, because Pinson's opposition to the motion to dismiss addresses only the transfer requests and not the deposition testimony or the records regarding Pinson's employment, the Court should treat Defendants' arguments as to the latter two sets of documents to be conceded.  See Defs.' Reply Supp. Mot. to Dismiss at 6–7.  Given Pinson's status as a *pro se* litigant, however, the Court nevertheless considers the merits of her claim regarding the deposition testimony and the records regarding her employment.

Central File") pursuant to BOP Program Statement 5800.17.  *See* Ex. A to Def.'s Mot. to Dismiss at 16, ECF No. 146-1 (indicating the order in which "Request for Transfer (all)" should be maintained among other materials in the Inmate Central File).  "It is well established that the Inmate Central Records System maintained by the [BOP] is exempt from the amendment requirements and the civil remedies provisions of the Privacy Act."  *Brown*, 602 F. Supp. 2d at 175 (citations omitted); *see also, e.g.*, *Martinez v. Bureau of Prisons*, 444 F.3d 620, 624 (D.C. Cir. 2006) ("The BOP has exempted its Inmate Central Record System from the accuracy provisions of the Privacy Act, 5 U.S.C. § 552a(e)(5)."); *Lynn v. Lappin*, 593 F. Supp. 2d 104, 107 (D.D.C. 2009) ("DOJ has properly exempted BOP's Inmate Central Record System 'entirely from the access and amendment requirements of 5 U.S.C. § 552a(d) and the civil remedies of 5 U.S.C. § 552a(g)[.]'" (citation omitted)).  Thus, Pinson's claims under the Privacy Act for injunctive relief or damages related to the transfer memoranda must fail.

Pinson objects, however, that "the transfers, and the retaliatory acts behind them, were not just in a Central File" because they were also "raised in administrative remedy requests and responses . . . and appeals thereof" and "detailed in FTCA claims and related documents, in complaints to BOP's Office of Internal Affairs, DOJ's Office of Inspector General, in correspondence between BOP's Office of Legislative Affairs and members of Congress, etc." Pl.'s Opp'n Mot. to Dismiss at 9–10.  Because Defendants "do[] not claim these systems too are exempt from the Privacy Act," Pinson contends, her Privacy Act claims should not be denied. *Id.* at 10.  But Pinson's SAC raised only the claims about the transfer memoranda; any such claims about purportedly false statements contained in other documents would be *new* claims that do not salvage her arguments about the transfer memoranda and that she cannot raise at this late stage.  *See Cheatham v. Wolf*, No. 18-cv-03026, 2020 WL 1047750, at *6 (D.D.C. Mar. 4,

2020) ("In order to survive a motion to dismiss, a plaintiff generally may not amend his complaint nor assert new claims by way of a brief in opposition.")[8]

### b. Deposition Testimony Transcript

Pinson's claims seeking injunctive relief and damages under the Privacy Act arising from Santana's deposition testimony must similarly fail.  First, as described above, agencies may promulgate rules and exempt systems of records from certain provisions of the Privacy Act.  *See* 5 U.S.C. § 552a(j).  The Department of Justice has set forth rules that exempt "[t]ranscripts of testimony given under oath or written statement made under oath" from the Privacy Act's amendment and correction provisions.  28 C.F.R. § 16.46(f)(1).  Accordingly, Pinson is not entitled to injunctive relief to amend any allegedly false information in the deposition transcript.

Pinson is not entitled to damages either.  Irrespective of whether Pinson brings her claim under 5 U.S.C. § 552a(g)(1)(C) or (g)(1)(D), she "must show that BOP's alleged violation caused [her] some adverse effect."  *Scott*, 937 F. Supp. 2d at 78 (D.D.C. 2013).  That is, "[t]o make out a damages claim, the alleged adverse determination must result from the inaccuracy of the records, not the mere existence of the records."  *Thompson v. Dep't of State*, 400 F.Supp.2d 1, 19 (D.D.C. 2005).  She "would need to show not only that the inaccurate records were considered in making the determination, but that an error in the records *caused* the

---

[8] Despite Pinson's status as a *pro se* plaintiff, the Court will decline to accept this new argument as a further amendment to her SAC to bring additional Privacy Act claims.  In support of her allegation that these alleged falsehoods are contained in other documents, Pinson includes an inmate request document dated July 17, 2020 that accuses various BOP officials of "telling lies to the Central Office, a federal judge, members of Congress and myself on top of documenting those lies in false government documents."  Pl.'s Opp'n Mot. to Dismiss at 18. Thus, based on what the Court can discern from Pinson's filing, Pinson has known about these allegedly false statements contained in other documents since before she sought leave to file her SAC in April 2021.  The Court will not add new claims at this late stage due to Pinson's undue delay and the undue prejudice to the opposing party.  *See Foman*, 371 U.S. at 182.

determination." *Id.* (emphasis in original); *see also Murphy v. United States*, 167 F. Supp. 2d 94, 97 (D.D.C. 2001), *aff'd*, 64 F. App'x 250 (D.C. Cir. 2003) ("In order to prevail, a plaintiff must show not only that records were inaccurate, but that it was the inaccuracy of the records that caused his injury.").  Here, Pinson has not only failed to specify what, precisely, adverse determination has resulted from Santana's deposition testimony, but has also not shown that any such adverse determination was in fact *caused* by the allegedly inaccurate record.  *See Chambers v. U.S. Dep't of Interior*, 568 F.3d 998, 1007 (D.C. Cir. 2009) (noting that subsection 552a(g)(1)(C) requires "a specific 'adverse determination' resulting from an agency's failure to maintain accurate records" and a plaintiff's mere claim that the agency's failure had an "adverse effect" on her ability to apply for jobs did not suffice).

In adding that Defendants have used "false information in agency records . . . to gain unfair advantage in litigation," Pinson seems to suggest that Santana's deposition testimony might have led to an adverse result in her prior case before this Court.  SAC at 17.  In that other case, the defendants submitted a motion for summary judgment that attached a transcript of Santana's deposition testimony.  Ex. 13 to Defs.' Mem. Supp. Mot. to Dismiss, Mot. for Recons., and Renewed Mot. for Summ. J. ("Defs.' Renewed Mot. for Summ. J."), *Pinson v. U.S. Dep't of Just.*, 12-cv-1872 (D.D.C.), ECF No. 477-17.  To support their contention that Pinson's First Amendment activity was not the "but-for" cause of her transfer to an Administrative Maximum Facility in Florence, Colorado ("ADX Florence"), which instead resulted from "a methodical review and determination . . . regarding the best way to manage an inmate who was adjusting poorly to her incarceration and plagued with disciplinary incidents," Defs.' Renewed Mot. for Summ. J. at 26, *Pinson v. U.S. Dep't of Just.*, 12-cv-1872 (D.D.C.) ECF No. 477-1, the defendants cited Santana's testimony as to why he approved Pinson's transfer, *see id.* at 27–28.

In ruling on the motion for summary judgment, however, this Court did not even cite Santana's testimony or assertions; indeed, the Court merely concluded that Pinson could not bring her First Amendment retaliation claims against BOP officers in their individual capacities under *Bivens*, and that her request for injunctive relief to enjoin BOP from transferring her to ADX Florence again was moot.  *See Pinson*, 514 F. Supp. 3d at 245–47.

Thus, Pinson has not shown a causal connection between the testimony and any adverse action.  For example, she has not shown that any "decisionmakers gave these statements any credence."  *Thompson*, 400 F.Supp.2d at 19.  Thus, the Court denies Pinson's Privacy Act claims for injunctive relief and damages relating to Santana's deposition testimony.

### c.  Records Regarding Employment

Finally, the Court understands Pinson to seek injunctive relief and damages for her Privacy Act claim regarding allegedly "false records" regarding Pinson's employment as set out in a settlement agreement for another lawsuit.  SAC at 17.  Pinson has not alleged what records, if any, submitted to the Middle District of Pennsylvania in the lawsuit were false.  *See id.*  It appears to the Court that the lawsuit at issue is *Pinson v. United States of America*, 18-cv-118 (M.D. Pa.).[9]  In fact, in the case before the Middle District of Pennsylvania, Pinson moved for sanctions against the defendants for "submit[ing] a materially false declaration indicating plaintiff received a job pursuant to her settlement and will commence it upon release from SHU."  Brief Supp. Mot. for Sanctions at 1, *Pinson v. United States of America*, 18-cv-118 (M.D. Pa.), ECF No. 58.  The defendants then responded in part that the declaration was not untrue given that "the Bureau of Prisons upheld its end of the agreement, assigned Pinson to a job within the

---

[9] The Court may take judicial notice of the record in a related action "pursuant to [the Court's] authority to judicially notice related proceedings in other courts."  *Dupree v. Jefferson*, 666 F.2d 606, 608 n.1 (D.C. Cir. 1981).

thirty-day time frame, and indicated the psychology position assigned to Pinson would be honored upon her release from the SHU, 'subject to the policies and regulations of the federal Bureau of Prisons' and 'conditioned on Pinson following prison regulations, policies, and institutional rules.'"  Defs.' Brief Opp'n Mot. for Sanctions at 6, *Pinson v. United States of America*, 18-cv-118 (M.D. Pa.), ECF No. 59 (citation omitted).  The Middle District of Pennsylvania denied Pinson's request for sanctions, noting that "there is no reason to suspect that the Government's declaration was filed in subjective bad faith or that counsel acted unreasonably in filing the declaration."  Order at 7, *Pinson v. United States of America*, 18-cv-118 (M.D. Pa.), ECF No. 62.  This conclusion by the Middle District of Pennsylvania regarding the absence of bad faith or unreasonable action by government counsel in that case weighs against finding, as necessary for monetary damages under the Privacy Act, intentionality or willfulness.  *See Dick*, 67 F. Supp. 3d at 175.  Moreover, considering the record of the proceedings in the Middle District of Pennsylvania and the fact that Pinson has failed to even allege how the records are inaccurate, the Court also dismisses Pinson's claim seeking injunctive relief.

### B.  Pinson's Motions

### 1.  Leave to Amend or File Supplemental Complaint

Pinson seeks leave to file a supplemental complaint to her SAC to reassert the First Amendment claim that she maintains that she dropped from her SAC in a "clerical error."  Pl.'s Mot. for Prelim. Inj. at 16.  She also appears to argue that she should be permitted to raise this First Amendment claim due to alleged retaliation, as evidenced by Incident Report 3695602, that has occurred after she filed the SAC.  *See id.* at 1.  Thus, the Court understands Pinson to be seeking leave to amend her SAC to correct an error and/or to supplement the SAC with a First Amendment claim based on events that occurred after the SAC was filed.  Although leave to

amend a complaint "shall be freely given when justice so requires," Fed. R. Civ. P. 15(a)(2), "the

Supreme Court has instructed federal courts to consider the following factors: (1) undue delay;

(2) the movant's bad faith or dilatory motive; (3) repeated failures to cure deficiencies by

amendments previously allowed; (4) undue prejudice to the opposing party by virtue of

permitting an amendment; and (5) futility of the amendment," *Norris*, 746 F. Supp. 2d at 3

(citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  Defendants argue that allowing Pinson to

amend her SAC to re-insert her First Amendment claim would be untimely and prejudicial.

Defs.' Opp'n Mot. for Prelim. Inj., Mot. to Appoint Counsel and File Supp. Compl. ("Defs.'

Opp'n Mot. for Prelim. Inj.") at 4–6, ECF No. 153.

     The Court agrees with Defendants.  The Court issued its opinion noting Pinson's dropped

First Amendment claim on March 9, 2022.  *Pinson*, 2022 WL 703924, at \*2.  Yet Pinson only

raised her assertion that she in fact intended to include her First Amendment claim in the SAC in

November 2022, *see generally* Pl.'s Mot. for Prelim. Inj., nearly three months *after* Defendants

filed their motion to dismiss in August 2022, *see generally* Defs.' Mot. to Dismiss.  Even

accounting for Pinson's status as a *pro se* litigant, Pinson had ample opportunity to raise this

issue before now.  Pinson's undue delay thus provides "sufficient reason" for the Court to deny

leave to amend.  *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996) (citation omitted);

*see Vanterpool v. Cuccinelli*, 998 F. Supp. 2d 451, 465 (E.D. Va. 2014) (denying request to

amend the Amended Complaint in light of the plaintiff's "prior opportunity to amend and the

delay that would result in granting leave for an additional amendment more than four months

after filing the Amended Complaint and more than three months after Defendants filed their

Motion to Dismiss").  For the same reason, amendment would impose undue prejudice on

Defendants.  Defendants have moved to dismiss several times in this matter; they have done so

again in reliance on Pinson's descriptions of her claims. *See generally* Defs. Mot. to Dismiss, ECF. No. 9; Defs.' Mot. to Dismiss, ECF No. 49; Defs.' Mot. Dismiss, ECF No. 54. Pinson's claim that she has suffered additional retaliation also does not suffice to merit further supplementation of the SAC at this extremely late stage of the litigation, given that the incident report at issue has since been expunged and she has not shown any evidence that Defendants have in fact deprived her of access to paper and envelopes in response to her litigation. *See infra* at 29 n.10, 33. For these reasons, the Court denies Pinson leave to further amend or supplement her SAC.

### 2. Motions for Sanctions

Pinson first seeks the imposition against Defendants and/or defense counsel for "filing a false declaration," which she identifies as the "Ulrich declaration." Pl.'s Mot. for Sanctions at 1–2. Although Pinson does not identify the specific declaration in question, this Court proceeds under the assumption that Pinson refers to the Jeremy Ulrich declaration ("Ulrich declaration") dated September 16, 2019, and filed on September 18, 2019 as an attachment to Defendants' opposition to a previous motion by Pinson for a preliminary injunction. *See* Ulrich Decl., ECF No. 72-1; Def.s' Opp'n Pl.'s Mot. for Sanctions at 1, ECF No. 151. Pinson previously sought sanctions from this Court for that same declaration, *see* Pl.'s Mot. for Sanctions and Evid. Hr'g, ECF No. 73, but her motion was denied, *see Pinson v. U.S. Dept. of Justice*, No. 18-cv-486, 2020 WL 1509517, at *25 (D.D.C. Mar. 30, 2020). As the Court noted at the time, the "core allegation" for why the Ulrich declaration may have been inaccurate was that he "misstated the number of sheets of paper prisoners are allocated per week," but the "misstatement was minor (involving a discrepancy of one page per week)" and "there [was] no allegation that the misstatement was made in bad faith, and thus the motion for sanctions must be denied." *Id.*

Pinson points the Court to two attached declarations, one of which is her own, that allege that SHU inmates are provided fewer pieces of paper and envelopes than indicated by the Ulrich declaration and that Pinson in particular is being denied paper and envelopes.[10]  *See* Pl.'s Mot. for Sanctions at 2; Attach. B to Pl.'s Mot. for Sanctions at 8; Attach. C to Pl.'s Mot. for Sanctions at 9.  But Pinson provides no argument for why sanctions should now be imposed for the filing of a declaration from over *three years ago*, even if circumstances have now changed such that its statements may no longer be true.  The Ulrich declaration represented only the SHU's practice at the time of the declaration; it did not represent that the provision of paper and envelopes would continue at the same rate or volume indefinitely.  *See* Ulrich Decl. at 1.  Thus, this Court denies Pinson's motion to sanction Defendants and/or defense counsel for filing this declaration.

Pinson next argues that Defendants should be sanctioned "for their threats to [P]laintiff and witnesses to her Court cases."  Pl.'s Mot. for Sanctions at 2.  In particular, she alleges that, "*[i]n an unrelated case*, BOP counsel submitted claims that BOP staff followed all policies and no harm was being directed at [P]laintiff."  *Id.* at 1 (emphasis added).  But, Pinson asserts, "[i]t was asserted by [ten] different inmates that counsel was lying and described in detail the multiple violations of [inmates'] rights by USP Tucson SHU staff," and "[t]hat abuse and interference in litigation is ongoing."  *Id.* at 1–2.  Although Pinson does not make clear what sanctions,

---

[10] Among the varied relief Pinson seeks in her motion for sanctions is a request that the Court issue an injunction "enjoining the ongoing threats, retaliation, and [withholding] of paper, envelopes, by Lt. A. DeLeon, Officers Fragoso and Merino, employees of defendant BOP."  Pl.'s Mot. for Sanctions at 2.  The Court notes the unexplained discrepancy that, despite Pinson's statement that BOP staff was told not to provide her with paper and envelopes, she has continued to draft handwritten motions and responses on paper that she has then filed with this Court by mail.  *See generally* Pl.'s Mot. for Sanctions; Pl.'s Mot. for Prelim. Inj.; Pl.'s Opp'n Defs.' Mot. to Dismiss.  Pinson has therefore not demonstrated that irreparable harm will result if injunctive relief is not granted.  *See Winter*, 555 U.S. at 21.

precisely, she seeks, the Court assumes that she requests the imposition of punitive sanctions. For the Court to impose punitive sanctions here, Pinson must demonstrate by clear and convincing evidence that Defendants attempted to tamper with Pinson and her witnesses' participation in this case. *See Landmark*, 82 F. Supp. 3d at 218; *Compton*, 938 F. Supp. 2d at 106; *Young*, 217 F.R.D. at 71.

As evidence of the alleged threats, Pinson attaches witness declarations from Edwin Wilke, Ryan Forrest, Donte Harris, Ernesto Zaragosa-Solis III, Joseph Berzat, and herself. Wilke Decl, Pl.'s Mot. for Sanctions at 3; Forrest Decl., Pl.'s Mot. for Sanctions at 4; Harris Decl., Pl.'s Mot. for Sanctions at 5; Zaragosa-Solis III Decl., Pl.'s Mot. for Sanctions at 6–7; Berzat Decl., Pl.'s Mot. for Sanctions at 8; Pinson Decl., Pl.'s Mot. for Sanctions at 9. The Court observes, however, that the Wilke, Forrest, and Harris declarations were originally filed in a prior, unrelated case about the SHU's alleged lack of COVID-19 precautions, which Pinson brought in the District of Arizona in April 2020.[11] Compl., *Pinson v. Othon, et al.*, No. 4:20-cv-00169 (D. Ariz.), ECF No. 1; Wilke Ariz. Decl., *Pinson v. Othon, et al.*, No. 4:20-cv-00169 (D. Ariz.), ECF No. 11-1; Forrest Ariz. Decl., *Pinson v. Othon, et al.*, No. 4:20-cv-00169 (D. Ariz.), ECF No. 11-3; Harris Ariz. Decl., *Pinson v. Othon, et al.*, No. 4:20-cv-00169 (D. Ariz.), ECF No. 108-4. Thus, these declarations relate to an entirely separate case—as evidenced by the fact that they focus primarily on COVID-19 issues. *See* Wilke Decl. at 1; Forrest Decl. at 1; Harris Decl. at 1. The Harris declaration, for instance, alleges that BOP staff made "disparaging remarks" about Pinson to her cellmate and said that those participating in her COVID-19 lawsuit would be transferred. Harris Decl. at 1. This declaration in particular has no connection to the

---

[11] Again, the Court takes judicial notice of proceedings in another court. *See Dupree*, 666 F.2d at 608 n.1.

issues before this Court.  Presumably, Pinson has provided the Wilke and Forrest declarations for their more generalized statements that the declarants have "heard Officer Schneider regularly screaming at [Pinson] for suing him" and the "[s]he is regularly abused by staff over her lawsuits here."  Wilke Decl. at 1; Forrest Decl. at 1.  But these declarations do not allege specifically that anyone has threatened Pinson or her witnesses in *this* case.  With respect to the conduct alleged in these three declarations, the Court will adhere to the general principle that it ought to "refrain from imposing sanctions for actions in other cases before other judges."  *Robertson v. Cartinhour*, 883 F. Supp. 2d 121, 129 (D.D.C. 2012), *aff'd*, 554 F. App'x 3 (D.C. Cir. 2014).

Pinson also provides three, more recent declarations—those of Zaragosa-Solis III and Berzat, as well as her own.  *See* Zaragosa-Solis III Decl., Pl.'s Mot. for Sanctions at 6–7; Berzat Decl., Pl.'s Mot. for Sanctions at 8; Pinson Decl., Pl.'s Mot. for Sanctions at 9.  Zaragosa-Solis states that a BOP lieutenant made it "crystal clear" to him that the warden sought to transfer Zaragosa-Solis to retaliate against Pinson and any inmate who "had helped her with her lawsuits as a witness against BOP staff."  Zaragosa-Solis III Decl. at 1.  Berzat states that an officer grabbed him by the wrist and handcuffs in a painful fashion and used abusive language toward him.  *See* Berzat Decl. at 1.  Using identical language, both Berzat and Zaragosa-Solis allege that, on October 28, 2022, Officer Fragoso "became very loud and [belligerent] with inmate Pinson" and called her a "tranny," "a bitch," and "a rat."  Zaragosa-Solis III Decl. at 1; Berzat Decl. at 1.  The declarations further allege that when Pinson asked for extra paper for a pending court deadline, Fragoso responded, "I'm not giving you extra paper to write up staff."  *Id.* Pinson's own declaration adds that she was told by BOP staff that they had been instructed to stop providing her with paper and envelopes.  Pinson Decl. at 1.

These declarations do not suffice to provide clear and convincing evidence meriting punitive sanctions.  Consider, for instance, the cases of *Compton* and *Young*.  In *Compton*, the plaintiffs alleged that the defendant, the Alpha Kappa Alpha Sorority, had engaged in witness tampering by sending letters to plaintiffs "that immediately suspended their membership privileges and threatened permanent expulsion because they filed this lawsuit."  938 F. Supp. 2d at 105.  Though noting the "wrongful, supercilious conduct" of the Sorority, the court denied the motion for sanctions without prejudice because the court had already denied the preliminary injunctive relief sought.  *Id.* at 105, 107.  But the court also stated that the plaintiffs would be able to "assert this issue later in the proceedings if they can show *specific evidence or testimony was unavailable* due to [the Sorority's] actions."  *Id.* at 107 (emphasis added).  In *Young*, the court concluded that there was such clear and convincing evidence of witness tampering where the plaintiff's brother testified as to having engaged in such tampering with the plaintiff's knowledge and where another witness testified to how the plaintiff had specifically sought to influence his statements.  217 F.R.D. at 68–69.

By contrast, Pinson has provided only scant evidence of the conduct purportedly warranting sanctions.  Unlike the witnesses in *Young* who testified in specific detail about the witness tampering, *id.*, and unlike the plaintiff in *Compton* who had the physical letters in their possession, 938 F. Supp. 2d at 105, the declarations here provide little detail about the purported threats against Pinson's witnesses.  The Zaragosa-Solis declaration contains only the bare allegation that it was made "crystal clear" to him that the warden wanted to transfer any inmate helping Pinson with her lawsuits, but does not specify any additional details or how this intention was made known to him.  Zaragosa-Solis III Decl. at 1.  Berzat's statement that a BOP officer grabbed him and used abusive language against him does not appear to have any ties to this case.

32

Berzat Decl. at 1.  And the declarations' allegations—made in identical language—that an officer called Pinson abusive names and told her that he would not provide her with paper, *id.*; Zaragosa-Solis III Decl. at 1, lack the detail and specificity provided in *Young*, which relied on witness testimony given in the witnesses' own words, *see* 217 F.R.D. at 68–69.  Moreover, none of the declarations at issue shows that the alleged conduct of BOP staff has had any effect on this case; Pinson has not alleged that any evidence or testimony was made unavailable in this case, nor has she shown that she has been unable to advance her case, because of Defendants' alleged actions.  For these reasons, the Court does not find clear and convincing evidence of conduct warranting sanctions against Defendants.

### 3.  Motion for Preliminary Injunction

On November 28, 2022, Pinson filed a motion that seeks a preliminary injunction and appears to request that the Court return her to the general population at USP Tucson and otherwise enjoin Defendants from taking any adverse action against her,[12] such as a transfer, resulting from Incident Report 3695602 or the investigation leading to the incident report.  Pl.'s Mot. for Prelim. Inj. at 7, 15, 18.  But Defendants have shown that the incident report at issue was expunged from Pinson's record on December 5, 2022.  *See* Ex. A to Defs.' Opp'n Pl.'s Mot. for Prelim. Inj. at 1, ECF No. 153-1.  Pinson has not evinced that she continues, or will continue, to suffer any consequences as a result of Incident Report 3695602 now that it has been expunged.  Accordingly, her request for a preliminary junction is moot.  *See Pinson v. Dukett*, No. CV-19-00422-TUC-RM, 2023 WL 2463786, at *1 (D. Ariz. Mar. 10, 2023) (denying

---

[12] Pinson also appears to request that the Court enjoin Defendants from taking adverse action against certain of her witnesses "in connection with the Oct. 5, 2022 interview and investigation that resulted in the Incident Report 3695602."  Pl.'s Mot. for Prelim. Inj. at 18. Pinson has not made any argument why the Court may grant any such relief for individuals who are not parties to this case.

Plaintiff's request for injunctive relief related to the same disciplinary report as that here because the report has been expunged); *cf. Lee v. Quay*, No. 1:21-CV-952, 2021 WL 4078047, at *2 (M.D. Pa. Sept. 8, 2021) (denying as moot the plaintiff's due process challenge related to incident report because the report was expunged and "no legal injury remains for this Court to remedy").  Therefore, the Court denies the motion for a preliminary injunction as moot.

### 4.  Appointment of Counsel

Finally, because the Court here dismisses Pinson's remaining claims and denies leave to further amend her SAC, Pinson does not have any need for the appointment of counsel.  The Court therefore denies both of her motions for appointment of counsel as moot.

### V.  CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss Second Amended Complaint (ECF No. 146) is **GRANTED**.  Further, Plaintiff's Motion for Sanctions, Appointment of Counsel, and Enlargement of Time (ECF No. 149) is **GRANTED IN PART AND DENIED IN PART**.  The Court grants Plaintiff's Motion for Sanctions, Appointment of Counsel, and Enlargement of Time *nunc pro tunc* only to the extent that Plaintiff's opposition to Defendants' motion to dismiss is deemed timely filed; the remainder of the motion is denied.  Finally, Plaintiff's Motion for Preliminary Injunction, Appointment of Counsel, and Leave to File a Supplemental Complaint (ECF No. 150) is **DENIED**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  March 30, 2023                                       RUDOLPH CONTRERAS
                                                            United States District Judge